[No. 52559–5.   En Banc.   October 8, 1987.]

FREDRIC HABERMAN, ET AL, *Appellants,* v. WASHINGTON PUBLIC POWER SUPPLY SYSTEM, ET AL, *Respondents.*

*Ferguson & Burdell,* by *Christopher Kane* and *Scott Tucker,* and *Thoreson, Yost, Berry & Matthews,* by *Ernest C. Matthews IV* (*Myer Feldman, Robert L. Deitz, Edward J. Tolchin,* and *Ginsburg, Feldman & Bress; Robert H. Jaffe, Howard G. Schlesinger,* and *Jaffe & Schlesinger,* of counsel), for appellants Haberman, et al.

*Smith, Smart, Hancock & Tabler,* by *Walter S. Tabler* (*Winthrop, Stimson, Putnam & Roberts,* by *John B. Daniels, David G. Keyko,* and *Susan J. Kohlmann,* of counsel), for appellants American Express Travel Related Services Co., et al.

*Culp, Dwyer, Guterson & Grader,* by *Robert D. Stewart,* and *Donovan, Leisure, Newton & Irvine,* by *Daniel R. Murdock,* for respondent Washington Public Power Supply

System.

*Helsell, Fetterman, Martin, Todd & Hokanson,* by *David F. Jurca* and *Linda J. Cochran,* for Columbia respondents.

*Syrdal, Danelo, Klein, Myre & Woods,* by *Peter A. Danelo* and *Otto G. Klein III* (*S. William Livingston, Jr., Peter J. Nickles,* and *Covington & Burling,* of counsel); *Davis, Wright & Jones,* by *Evan L. Schwab, Stephen M. Rummage,* and *David C. Tarshes*; *Reed, McClure, Moceri, Thonn & Moriarty,* by *Roy J. Moceri* and *D. Bradley Hudson*; *Karr, Tuttle, Koch, Campbell, Mawer & Morrow,* by *John F. Kruger* (*Bernard J. Smolens, Ralph Wellington, Arden J. Olson,* and *Schnader, Harrison, Segal & Lewis,* of counsel); *Sirianni & Youtz,* by *Chris R. Youtz* and *Stephen J. Sirianni* (*Robert M. Abrahams, Irwin J. Sugarman, Robert E. Bartkus,* and *Schulte, Roth & Zabel,* of counsel); *Williams, Kastner & Gibbs,* by *J. Kenneth McMullin* (*James J. Hagan, Elizabeth A. York,* and *Simpson, Thacher & Bartlett,* of counsel), for respondents Ebasco Services, Inc., et al.

*Riddell, Williams, Bullitt & Walkinshaw,* by *John D. Lowery, Hugh R. Tobin,* and *David R. Peeler,* for respondents Small Utilities Group.

*Foster, Pepper & Riviera,* by *Camden M. Hall, Stellman Keehnel,* and *Daniel L. Thieme*; *Culp, Dwyer, Guterson & Grader,* by *Robert D. Stewart*; *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim,* by *Albert R. Malanca* and *Donald S. Cohen*; *Harris, Mericle & Orr,* by *Jack G. Orr* (*Dennis K. Bromley, Robert A. Gordon,* and *Pillsbury, Madison & Sutro,* of counsel), for respondents Utility Defendants.

*Lane, Powell, Moss & Miller,* by *Larry S. Gangnes, John R. Tomlinson,* and *Paul D. Swanson* (*Rockne Gill, J. Laurence Cable, Bernard M. Ryan,* and *Schwabe, Williamson, Wyatt, Moore & Roberts*; *R. Erick Johnson, R. Daniel Lindahl,* and *Bullivant, Houser, Bailey, Hanna, Pendergrass,*

*Hoffman, O'Connel & Goyak; Peter R. Mersereau* and *Rankin, McMurry, Vavorsky & Doherty,* of counsel), for respondents Oregon Public Entities.

*Hillis, Cairncross, Clark & Martin, P.S.,* by *Michael F. Schumacher* and *Gregory E. Keller,* for respondents Inland Utilities.

*Bennett & Bigelow,* by *David A. Bennett* and *Elizabeth J. Blagg,* for respondent Dawson.

*Jim Jones, Attorney General for the State of Idaho,* and *Clive J. Strong, Deputy,* amici curiae.

BRACHTENBACH, J.—This case involves various bondholders' claims against the Washington Public Power Supply System (Supply System) and others for injuries resulting from the Supply System's default on $2.25 billion in revenue bonds issued to finance construction of two nuclear power generating plants. The trial court dismissed all bondholders' claims for their failure to state a claim for relief pursuant to CR 12(b)(6). We granted direct review and reverse the trial court's judgment on several issues.

Respondent Supply System is a "joint operating agency" and municipal corporation established and authorized by state law to finance, construct, own and operate electrical generating facilities. *See* RCW 43.52.360. Its members are 19 public utility defendants and four cities.

In the early 1970's, the Supply System began construction of three nuclear power generating plants WNP 1, WNP 2 and WNP 3. Those plants were developed in conjunction with a number of participating utilities from several northwestern states, including Washington. The Bonneville Power Administration (BPA), a federal agency, facilitated financing of the first three plants through complex "net–billing" agreements that allocated the risk of

noncompletion to the federal agency, combined the costs of the nuclear plants' construction with less costly hydropower, and resulted in an indirect guaranty by BPA. *See Chemical Bank v. WPPSS*, 99 Wn.2d 772, 779, 666 P.2d 329 (1983) (*Chemical Bank* I).

By 1974, it appeared that additional electrical power generation facilities would be needed to meet growing northwest power demands. To meet these demands, the Supply System decided that two additional nuclear power plants WNP 4 and WNP 5, would be necessary. WNP 4 was to be owned entirely by the Supply System; WNP 5 was to be owned 90 percent by the Supply System and 10 percent by Pacific Power and Light Company, a private utility.

In addition to the Supply System and Pacific Power and Light Company, 88 "Participants" were involved in these two projects: 9 Washington cities, 19 Washington public utility districts (PUD's), 1 Washington irrigation district, 7 Oregon cities, 4 Oregon peoples' utility districts, 5 Idaho cities, and 43 rural electric cooperatives, of which 13 are in Washington. The remaining rural electric cooperatives are in Idaho, Montana, Nevada, Oregon and Wyoming. These Participants include 20 of the 23 Supply System members.

The Supply System financed construction of WNP 4 and WNP 5 through the sale of revenue bonds. Changes in federal law, however, precluded use of "net–billing" as a security device as used in the WNP 1, WNP 2 and WNP 3 financing. As a result, in 1976 the Participants all entered into a "Participants' Agreement" with the Supply System. In this agreement, the Supply System promised to sell, and each Participant promised to buy its share of WNP 4 and WNP 5 "Project Capability". Project Capability was defined by the Participants' Agreement as:

> the amounts of electric power and energy, if any, which the Projects are capable of generating at any particular time (including times when either or both of the Plants are not operable or operating or the operation thereof is suspended, interrupted, interfered with, reduced or cur-

tailed, in each case in whole or in part for any reason whatsoever), less Project station use and losses.

Participants' Agreement, section 1(v). In essence, the Participants agreed to pay for their share of Project Capability regardless whether the projects ever produced electricity.

Each Participant agreed to begin monthly payments for its share commencing with the projects' date of completion, or within 1 year of the projects' termination. The Participants' Agreement also established a Participants' committee through which the Participants could disapprove certain actions taken by the Supply System's board of directors.

In 1977, the Supply System adopted bond resolution 890, a trust indenture which provided for its issuance of a series of revenue bonds to finance the WNP 4 and WNP 5 plants. Resolution 890 appointed a bond trustee, Chemical Bank, to represent the bondholders' interests. Resolution 890 required the Supply System to collect charges for Project Capability from the Participants as agreed in the Participants' Agreement so as to provide for payment of interest due on the revenue bonds issued. The effect of the Participants' Agreement together with resolution 890 was that the Participants indirectly guaranteed debt service on all the bonds issued by promising to purchase their shares of Project Capability once the projects were completed, or within 1 year of termination of construction.

Financing for the plants involved the capitalization of interest on a series of bonds. Under this arrangement, the Supply System would use future bond sales revenue to pay interest due on outstanding bonds until the completion of WNP 4 and WNP 5, when the operating revenues would then pay the debt service on the final series of bonds. Construction of WNP 4 and WNP 5 was originally projected to require $3.4 billion.

The Supply System, along with its investment advisors, prepared Official Statements to accompany the WNP 4 and WNP 5 bond offerings. These Official Statements contained opinions from engineers as to the structural and financial feasibility of the plants. Additionally, the Official State-

ments explained that the Participants were obligated to pay the costs of the plants, including debt service on the bonds, whether or not the plants ever were completed or generating power. The WNP 4 and WNP 5 bonds on their faces referred to resolution 890 and the Participants' guaranties to purchase Project Capability.

The Supply System sold the bonds through a 15–part integrated offering beginning in February 1977. All bonds were sold directly to underwriters pursuant to bidding procedures in RCW 43.52.343. These underwriters then resold the bonds to investors.

WNP 4 was projected to be operational by March 1982; WNP 5 by April 1984. Presumably, the final series of bonds would have been issued so as to coincide with these dates, allowing the operating revenues to pay the debt service obligations on the final series of bonds as originally planned. On May 29, 1981, however, the Supply System announced that because it was not able to obtain bond financing for its nuclear power projects for the following year, and because northwest power demands had not grown as anticipated, it was terminating WNP 4 and WNP 5. The Supply System formally withdrew the 15th bond offering, and announced that the cost estimates contained in the Official Statements issued with the last series of bonds on March 17, 1981, had been understated by approximately $5 billion. Final estimates of completion costs for WNP 4 and WNP 5 had also grown from the original $3.4 billion to nearly $12 billion. On January 22, 1982, the Supply System's board of directors unanimously voted to terminate WNP 4 and WNP 5 due to conditions beyond its ability to control. By that time, bonds outstanding had an aggregate face value of approximately $2.25 billion.

The Supply System's termination of the projects established a trigger date for various debt service payments, which by virtue of the Participants' Agreement and resolution 890, became the Participants' obligations. The estimated amount necessary to service the outstanding bonds is $7 billion.

Chemical Bank, on behalf of the WNP 4 and WNP 5 bondholders, filed a declaratory action to determine the enforceability of the Participants' Agreement. This court determined that the Washington municipal and public utility district Participants lacked statutory authority to enter into the Participants' Agreement, and declared the Agreement void and unenforceable. *See Chemical Bank* I, at 799. Moreover, this court held that the remaining Participants were released from their obligations under the Participants' Agreement on the basis of commercial frustration or impossibility, and mutual mistake. *See Chemical Bank v. WPPSS,* 102 Wn.2d 874, 888–89, 691 P.2d 524 (1984) (*Chemical Bank* II), *cert. denied,* 471 U.S. 1065, 1075 (1985).

This court denied plaintiffs Fredric Haberman and five others' motion to intervene in *Chemical Bank* II. Subsequently, on May 7, 1984, Haberman and other individual bondholders (plaintiffs) instituted this suit against the Supply System and others for numerous causes of action arising out of the WNP 4 and WNP 5 termination and resulting bond default. A group of institutional bondholders, including American Express Travel Related Services Company, Inc. (Amexco) and United States Trust Company of New York, joined the action as intervenor–plaintiffs (intervenors).

Five basic groups were named as defendants and are respondents on this appeal: the Supply System, the 23 members of the Supply System, Chemical Bank, the 88 WNP 4 and WNP 5 "Participants", and the professionals who rendered services to the Supply System. The respondent professionals include accountants Ernst & Whinney; investment advisors Blyth, Eastman, Paine, Webber, Inc., and its officers Donald Patterson and Stanley Pardo; engineers R. W. Beck and Associates, United Engineers and Constructors, Inc., and Ebasco Services, Inc.; attorneys Wood & Dawson, and Houghton, Cluck, Coughlin & Riley; and other unnamed professionals.

Plaintiffs' and intervenors' complaints allege that all

defendants knew or should have known: that the market could not support the extensive bond sales required to finance WNP 4 and WNP 5, and that the financing plan was otherwise insufficient; that the Participants' Agreement was unenforceable or that a declaratory judgment test case should have been filed to determine its enforceability before the bond issues; that all professionals performed their jobs negligently and rendered inaccurate information to the Supply System; and that predictions of the need for power made by the BPA were inaccurate. Several of plaintiffs' counts were not addressed by the trial court and were not briefed on this appeal.

The complaints reveal several bases upon which these actions are brought: aid in preparation of the Official Statements, which contained misstatements and material omissions; making negligent or fraudulent recommendations regarding need, cost, and feasibility to the Supply System that were placed in the Official Statements and Annual Reports, and were relied upon by the Supply System, bond rating agencies, government agencies, plaintiffs and intervenors; participation in the Supply System board of directors meetings and Participants' committee meetings; and omissions and misstatements regarding the enforceability of the Participants' Agreement.

Both plaintiffs and intervenors alleged violations of The Securities Act of Washington (WSSA), RCW 21.20, and asserted derivative negligent misrepresentation claims. The intervenors also alleged common law negligent misrepresentation, fraud, and violations of the Consumer Protection Act. Plaintiffs also alleged violations of the federal Securities Act of 1933, sought to add new plaintiffs and defendants, and to overturn the trial court ruling that service on Patterson and Pardo was defective.

The trial court dismissed all plaintiffs' and intervenors' claims pursuant to CR 12(b)(6) (failure to state a claim upon which relief may be granted). Plaintiffs and intervenors appealed; we accepted direct review.

## I
### THE STANDARD OF REVIEW

A trial court may grant dismissal for failure to state a claim under CR 12(b)(6) only if "'it appears beyond doubt that the plaintiff can prove no set of facts, consistent with the complaint, which would entitle the plaintiff to relief.'" *Bowman v. John Doe,* 104 Wn.2d 181, 183, 704 P.2d 140 (1985); *Orwick v. Seattle,* 103 Wn.2d 249, 254, 692 P.2d 793 (1984). CR 12(b)(6) motions should be granted "sparingly and with care". *Orwick,* at 254.

A plaintiff's factual allegations are presumed true for purposes of a CR 12(b)(6) motion. *Lawson v. State,* 107 Wn.2d 444, 448, 730 P.2d 1308 (1986); *Bowman,* at 183. A complaint survives a CR 12(b)(6) motion if any state of facts could exist under which the court could sustain the claim for relief. *Lawson,* at 448; *Bowman,* at 183; *Orwick,* at 255. Thus, a court may consider hypothetical facts not part of the formal record in deciding whether to dismiss a complaint pursuant to CR 12(b)(6). *Halvorson v. Dahl,* 89 Wn.2d 673, 675, 574 P.2d 1190 (1978).

CR 12(b)(6), read together with CR 8(a)(1), requires the court to decide whether the allegations in a complaint constitute a short and plain statement of the claim showing that the pleader is entitled to relief. *Orwick,* at 254. The court need not accept legal conclusions as correct. *See Orwick,* at 254; *State ex rel. Pirak v. Schoettler,* 45 Wn.2d 367, 370, 274 P.2d 852 (1954). When an area of the law involved is in the process of development, courts are reluctant to dismiss an action on the pleadings alone by way of a CR 12(b)(6) motion. 3A L. Orland, Wash. Prac. § 5152 (3d ed. 1980).

Notwithstanding the trial court's characterization of its dismissal as pursuant to CR 12(b)(6), respondents argue that because the court considered materials outside the complaint in reaching its decision, the dismissal should have been pursuant to CR 56 (summary judgment). *See* CR 12(b). (CR 12(b)(6) motion is converted into CR 56 summary judgment motion whenever matters outside the

pleadings are presented to and accepted by the court.)

While the submission and consolidation of extraneous materials by either party normally converts a CR 12(b)(6) motion to one for summary judgment, if the court can say that no matter what facts are proven within the context of the claim, the plaintiffs would not be entitled to relief, the motion remains one under CR 12(b)(6). *See Loger v. Washington Timber Prods., Inc.,* 8 Wn. App. 921, 924, 509 P.2d 1009, *review denied,* 82 Wn.2d 1011 (1973). In such a case, the presentation of extraneous evidence would be immaterial. *Loger,* at 924. In *Loger,* the trial judge considered matters outside the pleadings to enable him to understand the context of the CR 12 motion so as to rule on it as a matter of law, without reaching or resolving any factual dispute. *Loger,* at 926.

Plaintiffs and intervenors also argue that the trial court made factual findings. These purported findings were, however, determinations of law based upon the facts alleged in the complaint. We find that although the trial court considered matters extraneous to the complaints, it ruled as a matter of law that plaintiffs and intervenors had not stated a claim and did not make any determination of facts in dispute. We conclude that the proper standard of review remains that required by CR 12(b)(6). We therefore proceed to the remaining issues with this standard of review in mind.

## II
### Res Judicata Claims

Respondents argue that the doctrine of res judicata bars plaintiffs' and intervenors' claims. We disagree. This court previously determined that the Participants were not liable to repay principal and interest on WNP 4 and WNP 5 bonds because their obligations to do so were ultra vires acts, or unenforceable because of commercial frustration, impossibility, and mutual mistake. *See Chemical Bank* I; *Chemical Bank* II.

Res judicata prevents relitigation of claims already

decided. *Meder v. CCME Corp.*, 7 Wn. App. 801, 803, 502 P.2d 1252 (1972), *review denied*, 81 Wn.2d 1011 (1973). While res judicata bars relitigation of claims necessarily a part of a previous matter in controversy, it poses no bar to claims not in fact adjudicated previously. *Seattle–First Nat'l Bank v. Kawachi*, 91 Wn.2d 223, 226, 588 P.2d 725 (1978).

The prior *Chemical Bank* litigation dealt solely with contract claims between the Supply System and the Participants. No securities, consumer protection, or common law tort claims were at issue. A motion brought by plaintiffs to intervene in the *Chemical Bank* cases was denied as untimely. *See Chemical Bank* II, at 889. We conclude that res judicata does not bar the claims before this court.

### III
### FEDERAL SECURITIES ACT CLAIMS

Plaintiffs argue that the trial court improperly dismissed their federal securities claims. Section 12(2) of the federal Securities Act of 1933, 15 U.S.C. § 77*l*(2), provides a cause of action against any person who "offers or sells a security" through a prospectus containing misrepresentations or omissions. Section 3(a)(2) of the act exempts from section 12 any security issued by a public instrumentality. 15 U.S.C. § 77c(a)(2) (1981). While plaintiffs acknowledge that the WNP 4 and WNP 5 bonds are exempt from section 12, they claim that the Participants' guaranties of those bonds constitute separate securities that are subject to section 12 liability. Plaintiffs contend that whether the guaranties were separate securities was a factual question improperly decided by the trial court on a motion to dismiss.

First, we note that federal courts consistently determine as a matter of law whether investment schemes are securities. *See, e.g., Black v. Payne*, 591 F.2d 83, 86 n.1, 88 (9th Cir.) (affirming Fed. R. Civ. P. 12(b)(6) dismissal because no security involved), *cert. denied*, 444 U.S. 867 (1979); *De Luz Ranchos Inv. Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297, 1299–1301 (9th Cir. 1979) (question of law whether

investment scheme constituted a security); *Mason v. Unke-less,* 618 F.2d 597, 598 (9th Cir. 1980) (dismissal for failure to show a security was involved proper on Fed. R. Civ. P. 12(b)(6) motion); *Frederikson v. Poloway,* 637 F.2d 1147, 1153–54 (7th Cir.), *cert. denied,* 451 U.S. 1017 (1981) (dismissal because no security involved); *Ahrens v. American–Canadian Beaver Co.,* 428 F.2d 926, 928 (10th Cir. 1970) (question of law whether contracts were securities).

Next, we agree with the trial court's conclusion that the Participants' guaranties were not separate securities. A similar argument was rejected in *Woods v. Homes & Structures of Pittsburg, Kan., Inc.,* 489 F. Supp. 1270 (D. Kan. 1980). There, municipal bond purchasers sought to avoid the section 3(a)(2) exemption by arguing that certain insurance company guaranties attached to the bonds as certificates were separate securities subject to section 12(2). *Woods,* at 1292–94. The court noted that the guaranties had not been sold, nor could they have been purchased separately from the bonds. *Woods,* at 1293. The court concluded that the presence of the guaranties did not destroy the exemption created by the Securities Act of 1933 because the bonds were exempt and because the guaranties were part of those bonds. *Woods,* at 1293. *See also Johns Hopkins Univ. v. Hutton,* 422 F.2d 1124, 1128 (4th Cir. 1970).

Here, no separate Participants' guaranty existed. The Participants "guaranteed" only that they would purchase their share of WNP 4 and WNP 5 Project Capability whether or not power was produced. This obligation was an indirect guaranty of the bonds only by virtue of resolution 890, which empowered the Supply System to collect the amounts owed by the Participants pursuant to the Participants' Agreement to pay debt service to the bonds issued. The Participants did not guarantee payment on the bonds directly. The guaranties were neither sold, nor marketed, and could not have been purchased apart from the bonds. We conclude that the guaranties were not separate securities.

Finally, plaintiffs argue that our ruling in *Chemical Bank I*, voiding the Participants' guaranties as ultra vires, converted them into separate, nonexempt securities. This contention is without merit. Our *Chemical Bank* I and II decisions did not hold the guaranties nonexistent; rather we held the guaranties unenforceable. Even if we assume that the guaranties were somehow "converted" into separate securities, such securities remain exempt from section 12(2) liability because the Participants are all public instrumentalities within the meaning of section 3(a)(2) of the Securities Act of 1933. The trial court's dismissal of plaintiffs' Securities Act of 1933 claims is affirmed.

## IV
### SECURITIES ACT OF WASHINGTON

Plaintiffs and intervenors allege that all respondents made material misrepresentations and omissions in connection with the bond sales in violation of the Securities Act of Washington (WSSA). They sought recovery pursuant to the civil liability provisions of RCW 21.20.430(1), (3). The trial court dismissed all WSSA claims, holding as a matter of law that no respondent was a seller under RCW 21.20-.430(1); that no respondent controlled a seller within the meaning of RCW 21.20.430(3); and that RCW 21.20.430(7) barred negligence claims against all respondents except bond counsel Wood & Dawson because it requires proof of scienter.

## A
### Seller Claims Under RCW 21.20.430(1)

Plaintiffs and intervenors seek recovery under RCW 21.20.430(1) which provides that:

> *Any person, who offers or sells a security in violation of any provisions of RCW 21.20.010* or 21.20.140 through 21.20.230, *is liable to the person buying the security from him or her,* who may sue either at law or in equity to recover the consideration paid for the security, together with interest at eight percent per annum from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the secu-

rity, upon the tender of the security, or for damages if he or she no longer owns the security. Damages are the amount that would be recoverable upon a tender less (a) the value of the security when the buyer disposed of it and (b) interest at eight percent per annum from the date of disposition.

(Italics ours.) Plaintiffs and intervenors allege that respondents violated RCW 21.20.010(2) and (3) by making material misrepresentations, or omitting necessary facts to make statements not misleading, in the Official Statements and Annual Reports.

Plaintiffs and intervenors contend that the trial court erred in concluding that RCW 21.20.430(1) imposes liability only on the literal seller of a security who passes title directly to the plaintiff. Instead, plaintiffs and intervenors argue that RCW 21.20.430(1), like its federal counterpart from which it was derived, section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2), imposes liability on those persons who are a substantial factor in a sale of securities.

■ Washington's securities fraud laws are modeled after the Uniform Securities Act. RCW 21.20.430 parallels section 410 of the Uniform Securities Act, which in turn is modeled after section 12(2) of the federal Securities Act of 1933. *See* Comment, Uniform Securities Act § 410, 7B U.L.A. 644 (1985); L. Loss, *Commentary on the Uniform Securities Act* 147–48 (1976). Our Legislature provided that the WSSA

shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and administration of this chapter with the related federal regulation.

RCW 21.20.900. We have interpreted this provision to require harmony but not exact parallelism with other states' and federal law. *Kittilson v. Ford,* 93 Wn.2d 223, 227, 608 P.2d 264 (1980); *see Clausing v. DeHart,* 83 Wn.2d 70, 72–73, 515 P.2d 982 (1973) (applying federal analysis of Securities Exchange Act of 1934 to RCW 21.20.010). We note that while the purpose of federal securities laws is to

maintain the integrity of the secondary securities markets and to enforce disclosure, the WSSA is intended to protect investors. Comment, *Securities Fraud Under the Blue Sky of Washington,* 53 Wash. L. Rev. 279, 282 n.10 (1978); Rooks, *The Blue Sky of Washington: Registration of Securities of a New Venture,* 6 Gonz. L. Rev. 187, 188 (1971). To this end, this court has construed the WSSA broadly. *See McClellan v. Sundholm,* 89 Wn.2d 527, 533, 574 P.2d 371 (1978).

At least two Washington Court of Appeals decisions have interpreted the WSSA to impose liability upon persons rendering assistance in preparation of an unlawful sale of securities in violation of RCW 21.20.010. *See Golberg v. Sanglier,* 27 Wn. App. 179, 193, 616 P.2d 1239 (1980) (relying on *Kaas v. Privette,* 12 Wn. App. 142, 151, 529 P.2d 23 (1974)), *rev'd on other grounds,* 96 Wn.2d 874, 639 P.2d 1347, 647 P.2d 489 (1981). However, both decisions apparently presumed that liability attached pursuant to RCW 21.20.010 without determining civil liability under RCW 21.20.430(1).

In *McClellan v. Sundholm, supra* at 534, the court held a salesman liable under RCW 21.20.430(1) as a seller although the purchase agreement was between the buyer and the salesman's employer. Without discussing the absence of privity, the court found that because the salesman's actions constituted an "offer" of a security, his disposition of the security through the purchase agreement constituted a sale. *McClellan,* at 534.

Thus, although we have interpreted the offer and sell language in RCW 21.20.430(1) to be broad enough to include face to face "dispositions" of securities where privity is absent, we have not yet decided the scope of liability where privity is lacking.

An examination of federal court decisions interpreting section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2) shows that only two circuits require privity between a plaintiff–purchaser and defendant–seller. *See, e.g., Collins v. Signetics Corp.,* 605 F.2d 110, 113–14 (3d Cir. 1979);

*Sanders v. John Nuveen & Co.,* 619 F.2d 1222, 1226 (7th Cir. 1980), *cert. denied,* 450 U.S. 1005 (1981). This approach emphasizes the statutory language of section 12(2) in light of the Supreme Court's strict construction in securities cases not involving section 12(2). *See, e.g., Touche Ross & Co. v. Redington,* 442 U.S. 560, 578, 61 L. Ed. 2d 82, 99 S. Ct. 2479 (1979) (generalized references to the remedial purposes of The Securities Exchange Act of 1934 do not justify reading a provision more broadly than its language and the statutory scheme reasonably permit). In *Collins,* for example, the court concluded that a broad interpretation of section 12(2) would be contrary to its plain meaning and frustrate the overall statutory scheme where Congress had already provided a specific remedy for the purchaser against the defendant issuer of the securities in section 11 of the Securities Act of 1933. *Collins,* at 113.

The majority of the federal circuits, however, have construed the term seller to include those whose participation in the sale was a substantial factor in causing the transaction to take place. *See, e.g., Lawler v. Gilliam,* 569 F.2d 1283, 1287 (4th Cir. 1978); *Pharo v. Smith,* 621 F.2d 656, 665–67 (5th Cir. 1980), *rev'd in part on other grounds on rehearing,* 625 F.2d 1226 (5th Cir. 1980); *Davis v. AVCO Fin. Servs.,* 739 F.2d 1057, 1063–68 (6th Cir. 1984), *cert. denied,* 470 U.S. 1005, 472 U.S. 1012 (1985); *Stokes v. Lokken,* 644 F.2d 779, 785 (8th Cir. 1981); *Anderson v. Aurotek,* 774 F.2d 927, 930 (9th Cir. 1985); *SEC v. Murphy,* 626 F.2d 633, 650 (9th Cir. 1980); *Foster v. Jesup & Lamont Sec. Co.,* 759 F.2d 838, 843–44 (11th Cir. 1985), *aff'd,* 782 F.2d 901 (11th Cir. 1986); *see also In re Wicat Sec. Litig.,* 600 F. Supp. 1236, 1239, 1242 (D. Utah 1984) (although question of whether strict privity required not yet decided by Tenth Circuit, heavy weight of authority suggests substantial factor approach); *Cady v. Murphy,* 113 F.2d 988, 990 (1st Cir.), *cert. denied,* 311 U.S. 705 (1940) (broker who acted as agent for seller could be liable under section 12(2)).

The Supreme Court has not yet addressed this issue, but

has most recently emphasized the cumulative remedial purpose of the securities laws is not to be ignored in their interpretation. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 386–87, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983); *see also Davis,* 739 F.2d at 1064 (Supreme Court has called for flexible yet literal interpretation of the securities acts).

This substantial factor–proximate cause approach originated in *Lennerth v. Mendenhall,* 234 F. Supp. 59, 65 (N.D. Ohio 1964), where the court stated:

> [L]iability must lie somewhere between the narrow view, which holds only the parties to the sale, and the too–liberal view which would hold all who remotely participated in the events leading up to the transaction. We think that the line of demarcation must be drawn in terms of cause and effect: To borrow a phrase from the law of negligence, did the injury to the plaintiff flow directly and proximately from the actions of this particular defendant? If the answer is in the affirmative, we would hold him liable. But for the presence of the defendant . . . in the negotiations preceding the sale, could the sale have been consummated? If the answer is in the negative, and we find that the transaction could never have materialized without the efforts of that defendant, we must find him guilty.
>
> . . . The hunter who seduces the prey and leads it to the trap he has set is no less guilty than the hunter whose hand springs the snare. We find that the activity of the corporate defendant's agent . . . is tantamount to that of a "seller" within the liberal remedial spirit of the securities laws.

The *Lennerth* court's proximate cause theory has been refined to the present substantial factor–proximate cause in subsequent cases. *Davis,* at 1066–67.

The *Davis* court concluded that a substantial factor test "constitutes an appropriate synthesis of the sometimes antithetical policies that the securities laws are to be construed as statutes while, at the same time, giving effect to their far–reaching remedial purpose." *Davis,* at 1067. Indeed, as noted by one commentator, a strict privity requirement applied to a firm commitment underwriting

agreement, where underwriters buy the securities from the corporation without recourse if they cannot sell the entire block of shares, would allow a cause of action only against the underwriter, even where the corporation was the issuer raising capital through the sale. Note, *Seller Liability Under Section 12(2) of the Securities Act of 1933: A Proximate Cause Substantial Factor Approach Limited by a Duty of Inquiry,* 36 Vand. L. Rev. 361, 389–90 (1983). Such a result could not have been intended by Congress and should not be allowed to defeat the remedial purposes of the securities laws. Note, 36 Vand. L. Rev., at 389–90.

A review of other states' decisions as to the scope of "seller" under their securities laws is inconclusive. The Oklahoma Supreme Court refused to construe language in its statute similar to that in RCW 21.20.430(1) to include participants in the securities transaction. *Nikkel v. Stifel, Nicolaus & Co.,* 542 P.2d 1305, 1307 (Okla. 1975). On the other hand, the Minnesota Court of Appeals has adopted a substantial factor test to determine seller liability under its securities act based on section 410 of the Uniform Securities Act and section 12(2). *Anders v. Dakota Land & Dev. Co.,* 380 N.W.2d 862 (Minn. Ct. App. 1986). This court's research disclosed no other state court decisions construing state securities laws similar to RCW 21.20.430(1).

Although other federal courts have construed similar state securities statutes, the decisions do not reflect state court analysis. They instead reflect a federal analysis of section 12(2) as applied to the state law in question. Moreover, the analysis applied by federal trial courts in these cases is usually that of their respective federal circuits. *See, e.g., Dahl v. Pinter,* 787 F.2d 985, 991 (5th Cir. 1986) (Texas test for seller liability substantially similar to Fifth Circuit substantial factor test), *cert. granted,* ___ U.S. ___, 95 L. Ed. 2d 493, 107 S. Ct. 1885 (1987); *Huddleston v. Herman & MacLean,* 640 F.2d 534, 550–51 (5th Cir. 1981) (interpreting Texas Securities Act to impose liability on persons constituting a substantial factor in sale, noting that Texas statutory comments referred to section 12(2) as

model for state act and noting that the Fifth Circuit uses substantial factor test), *rev'd on other grounds,* 459 U.S. 375 (1983); *see also Anderson v. Aurotek,* 774 F.2d at 929 n.1 (assuming that Washington securities statute interpreted in same manner as section 12(2), finding substantial factor liability); *SEC v. Seaboard Corp.,* 677 F.2d 1289, 1295 (9th Cir. 1982) (California requires direct privity, no California precedent); *In re Victor Technologies Sec. Litig.,* Blue Sky L. Rep. (CCH) ¶ 72,491 (N.D. Cal. 1987) (relying on *In re Diasonics Sec. Litig.,* 599 F. Supp. 447, 459 (N.D. Cal. 1984) (finding that California Securities Act requires privity)); *In re Catanella & E.F. Hutton & Co. Sec. Litig.,* 583 F. Supp. 1388, 1440 (E.D. Pa. 1984) (Pennsylvania securities statute privity requirement likened to that found in section 12(2)); *Ging v. Parker–Hunter, Inc.,* 544 F. Supp. 49, 52 (W.D. Pa. 1982) (determining that Pennsylvania Securities Act requires strict privity, no Pennsylvania precedent). In any event, federal law does not preempt or control state securities acts. *See* Securities Act of 1933, § 18, 15 U.S.C. § 77r.

We conclude that the substantial factor–proximate cause definition of seller prevailing in the federal circuits provides the best guidance for our analysis of seller liability under RCW 21.20.430(1). We note that our conclusion is in accord with the views expressed in the official comments to the recently revised Uniform Securities Act of 1985. Although not adopted in Washington, new section 605(a) of the Uniform Securities Act contains the language of old section 410 upon which RCW 21.20.430(1) was based. The official comments to section 605(a) state that under this section, "liability may be imposed on a person in addition to the immediate seller if the person's participation was a substantial contributive factor in the violation." Uniform Securities Act, § 605 comment, 7B U.L.A. 81 (Supp. 1987) (citing *Davis,* 739 F.2d at 1057). We believe this approach best promotes the legislative purpose behind the WSSA, while harmonizing our statutory scheme with federal and other state decisions. We also believe this definition is in

harmony with similar developments in general tort law. *Davis,* at 1066.

The Ninth Circuit has described its substantial factor–proximate cause analysis as follows:

> In assessing proximate cause, courts focus first on whether a defendant's acts were the *actual cause* of the injury, *i.e.,* whether 'but for' the defendant's conduct, there would have been no sale. *Nicewarner v. Bleavins, supra,* 244 F. Supp. [261] at 266 (D.Colo.1965); *see Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d [680, 693 (5th Cir. 1971)]; *Lennerth v. Mendenhall, supra,* 234 F.Supp. at 65. A finding of "but for" causation, alone, does not satisfy proximate cause, however. *See Nicewarner v. Bleavins, supra,* 244 F.Supp. at 266; R. Jennings & H. Marsh, Securities Regulation 1096 (4th ed. 1977); W. Prosser, Handbook of the Law of Torts 238–39, 244 (4th ed. 1971). Prior to the issuance of a security, numerous persons perform mechanical acts without which there could be no sale. For example, a printer may prepare key documents or a bank may advance cash to a customer upon the customer's presentation of an instrument and then pass the instrument to another person. Both would satisfy a "but for" causation test, but these acts nonetheless do not render the defendants sellers. *See First Trust & Savings Bank v. Fidelity–Philadelphia Trust Co.,* 214 F.2d 320 (3d Cir. 1954); Ruder, Multiple Defendants in Securities Law Fraud Cases, 120 U.Pa.L.Rev. 597, 646 (1972). Before a person's acts can be considered the proximate cause of a sale, his acts must also be a substantial factor in bringing about the transaction. *Lewis v. Walston & Co., Inc.,* 487 F.2d 617, 621–22 (5th Cir. 1973). *See* Restatement (Second) of Torts § 431 (1965).

*SEC v. Murphy,* 626 F.2d 633, 650 (9th Cir. 1980).

In a similar fashion, we hold that a defendant is liable as a seller under RCW 21.20.430(1) if his acts were a substantial contributive factor in the sales transaction. Considerations important in determining whether a defendant's conduct is a substantial contributive factor in the sales transaction include: (1) the number of other factors which contribute to the sale and the extent of the effect which they have in producing it; (2) whether the defendant's con-

duct has created a force or series of forces which are in continuous and active operation up to the time of the sale, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; and (3) lapse of time. *See generally* Restatement (Second) of Torts §§ 432, 433 (1977). Whether a defendant's conduct was a substantial contributive factor is necessarily a question of fact.

We emphasize that our adoption of a substantial contributive factor test to determine seller liability under RCW 21.20.430(1) is distinct from the test for participant liability pursuant to RCW 21.20.430(3). Our substantial contributive factor analysis simply expands the strict privity approach to sellers so as to include those parties who have the attributes of a seller and thus who policy dictates should be subject to liability under RCW 21.20.430(1), but who would escape primary liability for want of privity.

Here, for example, the Supply System sold all the bonds to underwriters who then sold them to plaintiffs and intervenors. If we were to require strict privity for liability under RCW 21.20.430(1), only the underwriters would be potentially liable for prospectus fraud, cutting off all potential claims against the issuer of the bonds and others acting together with the issuer who were the actual beneficiaries of the sale proceeds. The result allows issuers of securities to insulate themselves from liability to ultimate purchasers simply by selling to middlemen beyond their control, even in situations where they know that the securities will be resold immediately to buyers who will rely on Official Statements and Annual Reports written by the issuer to facilitate the sales. Unlike the federal Securities Act of 1933, § 11, the WSSA does not provide for separate issuer liability. Thus, if privity were required for liability under RCW 21.20.430(1), an issuer in a firm commitment underwriting would never be liable, regardless of its culpability. We find such a result contrary to the clear purposes of the WSSA.

RCW 21.20.430(1) liability remains based on a defend-

ant's status as seller. RCW 21.20.430(3) liability is based on other defendants' relationships to a seller liable under RCW 21.20.430(1). Therefore, respondents' argument that a substantial contributive factor approach to seller in RCW 21.20.430(1) would render RCW 21.20.430(3) meaningless is without merit. Although some secondarily liable parties under RCW 21.20.430(3) may also be liable as sellers under RCW 21.20.430(1), clearly not all secondarily liable parties are sellers under the substantial contributive factor test. Thus, as contemplated by the statutory scheme, participants who are involved in a securities sale, but who are not substantial contributive factors, may be subject to secondary liability under RCW 21.20.430(3).

We therefore reverse the trial court's dismissal of plaintiffs' and intervenors' securities claims under RCW 21.20-.430(1).

B
Secondary Liability Claims Under RCW 21.20.430(3)

Our conclusion that seller liability pursuant to RCW 21.20.430(1) is to be determined through a substantial contributive factor analysis necessarily requires us to reverse the trial court's dismissal of plaintiffs' and intervenors' secondary liability claims pursuant to RCW 21.20.430(3). Because secondary liability under RCW 21.20.430(3) would be based on a party's relationship to a seller of securities, the sufficiency of plaintiffs' and intervenors' allegations of secondary liability can only be determined after the sellers are identified. We also reverse the trial court's determination that respondent nonmember Participants are not secondarily liable because they did not control the Supply System. For purposes of our CR 12(b)(6) standard of review, it is conceivable that nonmember Participants may be secondarily liable because of their relationship to a party other than the Supply System. We cannot say, without a determination of all sellers potentially liable under RCW 21.20.430(1), that these respondents did not control any seller.

## C
### Implied Remedy Under RCW 21.20.010

In the alternative, intervenors argue that RCW 21.20.010 provides an implied remedy to fill any liability gap created by a strict privity requirement under RCW 21.20.430(1). Because we find that RCW 21.20.430(1) provides an express remedy available to intervenors, we need not address the issue.

## D
### Extraterritorial Application of the WSSA

Respondent Small Utilities Group contends that the trial court's dismissal of plaintiffs' and intervenors' WSSA claims should be upheld because the WSSA should not be applied extraterritorially to out–of–state defendants or transactions. Small Utilities Group also contends that extraterritorial application of the WSSA would violate the commerce clause. We disagree with both contentions.

Initially, we note that this issue involves the choice of law to be applied in this case rather than whether the WSSA can be applied extraterritorially to regulate out–of–state transactions. Here, we are not concerned with the application of the WSSA within another state's jurisdiction. Instead, the question before us is whether the WSSA applies in an action brought in a Washington forum where out–of–state parties are under this State's jurisdiction. As a result, choice of law principles govern our analysis.

This court employs a "most significant relationship" standard to determine what law governs in a contracts or torts case. *Southwell v. Widing Transp., Inc.*, 101 Wn.2d 200, 204, 676 P.2d 477 (1984); *Johnson v. Spider Staging Corp.*, 87 Wn.2d 577, 580, 555 P.2d 997 (1976). This standard requires a court to evaluate the contacts of the interested jurisdictions with respect to the claims at issue and the interests and policies of those jurisdictions. *Southwell*, at 204.

Here, Washington is clearly the state with the most substantial contacts with the subject matter of this case. The

bonds at issue were issued by the Supply System to finance two nuclear power plants in Washington. The Supply System, respondent members and directors, one respondent bond counsel, as well as the majority of the respondent Participants are Washington residents. All respondents had substantial business dealings in Washington, and the Official Statements and Annual Reports allegedly containing misrepresentations emanated from this state. No party contends that another state's securities act applies. Moreover, Washington State has an interest in regulating the conduct of parties involved in the sale of bonds issued by a municipal corporation, the Supply System, to finance construction of in–state power generating facilities. We conclude that the contacts of the parties involved, the claims at issue, and the interests of this State dictate our application of the WSSA to this case.

Nevertheless, Small Utilities Group contends that our application of the WSSA would violate the commerce clause. Their argument is based on *Edgar v. MITE Corp.*, 457 U.S. 624, 641, 73 L. Ed. 2d 269, 102 S. Ct. 2629 (1982). *Edgar* involved a commerce clause challenge to an Illinois statute regulating corporate takeovers in a multistate context. The statute could be applied to regulate tender offers not affecting Illinois shareholders. *Edgar,* at 642. The Court found that the burden on interstate commerce posed by the statute was not counterbalanced by local interests, and that the statute upset the balance struck by Congress between corporate management and takeover bidders in its regulation of interstate tender offers. *Edgar,* at 643–46. The Court noted that an impermissible conflict between federal and state regulation of commerce exists where compliance with both federal and state regulations is physically impossible, or where state law interferes with the accomplishment and execution of congressional purposes and objectives. *Edgar,* at 631.

Here, our application of the WSSA does not impinge on federal regulation of commerce as did the Illinois anti–takeover statute under scrutiny in *Edgar.* First, our appli-

cation of the WSSA to this case is based on the substantial relationship between the subject matter, the parties, and the forum state. Unlike the Illinois statute in *Edgar,* we do not attempt to apply the WSSA to transactions completely unrelated to Washington. Moreover, in contrast to the corporate takeover regulations at issue in *Edgar,* Congress explicitly provided that federal and state securities regulation may co-exist absent conflict. *See* 15 U.S.C. §§ 77r, 78bb(a) (1981). The WSSA is intended to be coordinated with related federal regulation. RCW 21.20.900. Our application of the WSSA in this case in no way affects the federal regulatory scheme enacted by Congress to regulate interstate securities transactions. Finally the impact of our application of the WSSA on interstate commerce does not rise to the level of an impermissible burden like that found in *Edgar.*

> Not every exercise of state power with some impact on interstate commerce is invalid. A state statute must be upheld if it "regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental . . . unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."

*Edgar,* at 640, citing *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 25 L. Ed. 2d 174, 90 S. Ct. 844 (1970).

Washington's interests in regulating bond issues by municipal corporations, and in providing a forum for claims arising from those issues outweigh the impact that our application of the WSSA in this case will have on interstate commerce, particularly when considering the substantial relationship between this state and the case in controversy. *See In re WPPSS Sec. Litig.,* [new matters] Blue Sky L. Rep. (CCH) ¶ 72,371, 71,683 (W.D. Wash. 1986); Lewis v. Berry, No. C82-1244VR (W.D. Wash. May 24, 1985) (WSSA antifraud provision does not burden interstate commerce; it is clearly justified by the local interests served). Thus, we find no violation of the commerce clause. The WSSA may be properly applied to this case.

## E
### Scienter Amendment Claims

The trial court held that RCW 21.20.430(7) applied retroactively to bar plaintiffs' and intervenors' WSSA claims. Plaintiffs and intervenors, together with respondent/cross–appellant Wood & Dawson, challenge RCW 21.20.430(7) on several constitutional grounds.

As amended in 1985, RCW 21.20.430(7) provides that:

Notwithstanding subsections (1) through (6) of this section, if an initial offer or sale of securities that are exempt from registration under RCW 21.20.310 *is made by this state or its agencies,* political subdivisions, municipal or quasi–municipal corporations, or other instrumentality of one or more of the foregoing and is in violation of RCW 21.20.010(2), and any such issuer, member of the governing body, committee member, public officer, director, employee, or agent of such issuer acting on its behalf, or person in control of such issuer, member of the governing body, committee member, public officer, director, employee, or agent of such person acting on its behalf, materially aids in the offer or sale, such person is liable to the purchaser of the security *only if the purchaser establishes scienter on the part of the defendant.* The word "employee" or the word "agent," as such words are used in this subsection, do not include a bond counsel or an underwriter. *Under no circumstances whatsoever shall this subsection be applied to require purchasers to establish scienter on the part of bond counsels or underwriters.*

(Italics ours.) RCW 21.20.430(7) (Laws of 1985, ch. 171, § 1). The Legislature again amended RCW 21.20.430(7) in 1986, adding that:

The provisions of this subsection *are retroactive* and apply to any action commenced but not final before July 27, 1985. In addition, the provisions of this subsection apply to any action commenced on or after July 27, 1985.

(Italics ours.) RCW 21.20.430(7) (Laws of 1986, ch. 304, § 1).

### 1. *Equal Protection*

Initially, plaintiffs and intervenors argue that RCW

21.20.430(7) violates their state and federal equal protection guaranties by treating similarly situated persons unequally. They contend that RCW 21.20.430(7) impermissibly distinguishes between public and private defendants, and in-state and out-of-state public issuers.

Within the context of their equal protection claims, intervenors also contend that RCW 21.20.430(7) violates the federal commerce clause because it discriminates between in-state and out-of-state public issuers. However, intervenors' argument mischaracterizes the nature of the commerce clause. While the commerce clause is designed to prevent states from burdening the free flow of interstate commerce, *Massachusetts v. United States,* 435 U.S. 444, 462, 55 L. Ed. 2d 403, 98 S. Ct. 1153 (1978), the equal protection clause protects persons from unconstitutional discrimination by the states, *Metropolitan Life Ins. Co. v. Ward,* 470 U.S. 869, 881, 84 L. Ed. 2d 751, 105 S. Ct. 1676, *reh'g denied,* 471 U.S. 1120 (1985). Here, intervenors' commerce clause claims are better characterized as part of their equal protection claims; we will consider them as such.

Respondents argue that because plaintiffs' and intervenors' equal protection rights are not affected by the statute's distinction between public and private issuers, and between in-state and out-of-state public issuers, they lack standing to assert these claims. We agree.

The doctrine of standing prohibits a litigant from raising another's legal rights. *Allen v. Wright,* 468 U.S. 737, 750–51, 82 L. Ed. 2d 556, 104 S. Ct. 3315, *reh'g denied,* 468 U.S. 1250 (1984). One who is not adversely affected by a statute may not question its validity. *State v. Carroll,* 81 Wn.2d 95, 103–04, 500 P.2d 115 (1972); *State v. Sluder,* 11 Wn. App. 8, 10, 521 P.2d 971, *review denied,* 84 Wn.2d 1008 (1974). Here, no plaintiff or intervenor is a public or private defendant for RCW 21.20.430(7) purposes, and no out-of-state issuer of securities is party to this suit. Plaintiffs and intervenors improperly attempt to assert the equal protection rights of other parties and nonparties. We conclude that plaintiffs' and intervenors' state and federal equal

protection claims fail for lack of standing.

Notwithstanding plaintiffs' and intervenors' lack of standing, respondent/cross–appellant Wood & Dawson argues that RCW 21.20.430(7) violates its equal protection rights by distinguishing between a public issuer's bond counsel, against whom a plaintiff need only establish negligence, and other employees and agents of that issuer, against whom scienter must be proved. Wood & Dawson, as bond counsel to the Supply System, a public issuer within the meaning of RCW 21.20.430(7), does have standing to assert its equal protection claims.

■ A party challenging a legislative classification has the heavy burden of overcoming the presumption of a statute's constitutionality. *Yakima Cy. Deputy Sheriff's Ass'n v. Board of Comm'rs,* 92 Wn.2d 831, 835, 601 P.2d 936 (1979), *appeal dismissed,* 446 U.S. 979, 64 L. Ed. 2d 835, 100 S. Ct. 2958 (1980). A statute should not be declared unconstitutional unless it appears unconstitutional beyond a reasonable doubt. *State v. Maciolek,* 101 Wn.2d 259, 263, 676 P.2d 996 (1984).

■ At the threshold of any equal protection determination, the court must identify the appropriate standard of judicial review. *Convention Ctr. Coalition v. Seattle,* 107 Wn.2d 370, 378, 730 P.2d 636 (1986). Here, because RCW 21.20.430(7) does not involve a suspect classification or fundamental right, we apply a rational basis test. *See Convention Ctr. Coalition,* at 378.

Under a rational basis test the court must determine: (1) whether the legislation applies alike to all members within a designated class; (2) whether there are reasonable grounds to distinguish between those within and those without the class; and (3) whether the classification has a rational relationship to the purpose of the legislation. *Convention Ctr. Coalition,* at 378–79.

■ Wood & Dawson first contends that RCW 21.20-.430(7) treats members of the same class differently. Wood & Dawson claims that some "agents" are subject to a scienter standard while other "agents"—bond counsel—are sub-

ject only to negligence. We disagree. RCW 21.20.430(7) clearly exempts bond counsel from its definition of agent or employee. As a result, the statute creates a distinction between two classes, agents and bond counsel, not between members of the same class.

Wood & Dawson next argues that no rational basis exists for the RCW 21.20.430(7) distinction between bond counsel and agents. Again we disagree. Under the rational basis test, a statutory classification will be upheld if any state of facts may reasonably be conceived to substantiate it. *Automobile Drivers & Demonstrators, Local 882 v. Department of Retirement Sys.*, 92 Wn.2d 415, 422, 598 P.2d 379 (1979), *appeal dismissed, cert. denied*, 444 U.S. 1040 (1980); *see also Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 528, 3 L. Ed. 2d 480, 79 S. Ct. 437 (1959). Such a rational basis for a legislative decision need not have actually motivated the Legislature's decision. *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 66 L. Ed. 2d 368, 101 S. Ct. 453 (1980), *reh'g denied*, 450 U.S. 960 (1981).

> States are not required to convince the courts of the correctness of their legislative judgments . . .
>
> Parties challenging legislation under the Equal Protection Clause . . . cannot prevail so long as "it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice, that the question is at least debatable."

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 66 L. Ed. 2d 659, 101 S. Ct. 715, *reh'g denied*, 450 U.S. 1027 (1981) (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 154, 82 L. Ed. 1234, 58 S. Ct. 778 (1938)).

Here, we find several reasonable grounds upon which the Legislature could have based its decision to distinguish agents of public issuers from bond counsel. First, the Legislature could have reasonably concluded that bond counsel should be held to a higher standard of care because of their expertise upon which the public at large has a right to rely. Also, the Legislature may have concluded that because

bond counsel, like underwriters, are among the last "links in the chain" in the sale of bonds to the public, they are in a better position to protect the public from misrepresentations or omissions in the sale of securities. Thus, the Legislature may have retained a negligence standard to encourage greater diligence on the part of bond counsel prior to distribution of bonds to the public. Furthermore, bond counsel typically provides the principal opinion letter upon which the underwriters, investors and issuers rely to determine the validity of an offering. *See* Comment, *The Function and Professional Responsibilities of Bond Counsel,* 16 Urb. Law. 489, 490–91 (1984). Bond counsel therefore perform different functions than other agents or employees of public issuers. Finally, the Legislature may have reasonably distinguished between bond counsel and public issuer agents and employees on the basis of compensation. Here, for example, plaintiffs allege that respondent bond counsels' compensation was based on a percentage of the dollar value of the bonds sold. See Plaintiffs' third amended complaint, at 48; Clerk's Papers, at 1044. Bond counsel may have a greater incentive to "sell" the bonds than do agents or employees of public issuers who are compensated by contract. The Legislature could have determined that bond counsel are thus more profit oriented and less public interest oriented than other agents of a public issuer. We conclude that reasonable grounds exist to support the Legislature's distinction between bond counsel and other agents or employees of public issuers of securities.

With these grounds on which the Legislature could have based its classifications in mind, we also conclude that the classifications are rationally related to the remedial purposes of the WSSA. Presuming that the Legislature had reason to distinguish between bond counsel and other agents of public issuers on the basis of their abilities to protect the public, the Legislature's decision to hold bond counsel to a negligence standard must prevail.

Therefore, because there exists a reasonable basis for the Legislature's distinction between bond counsel and other

agents of public issuers and because this basis is rationally related to the overall purpose of the WSSA, we conclude that RCW 21.20.430(7) does not violate Wood & Dawson's state or federal equal protection rights.

### 2. *Special Legislation*

We also find that RCW 21.20.430(7) is not special legislation prohibited by Const. art. 2, § 28(17). It is a general law applicable to all public issuers of securities that are exempt from registration under RCW 21.20.310. *See Libby, McNeill & Libby v. Ivarson,* 19 Wn.2d 723, 730, 144 P.2d 258 (1943) (special laws relate to particular persons or things, while general laws operate on all persons or things constituting a class); *Swanson v. School Dist. 15,* 109 Wash. 652, 654, 657, 187 P. 386 (1920) (statute relieving school districts and their officers, agents or employees from liability for injuries arising out of manual training equipment not special legislation because the act applied to all school districts in state). Moreover, a party challenging a statute as special legislation must show that the classification made by a statute, as well as the statute itself, is not rationally related to the purpose of the statute. *See Seattle v. State,* 103 Wn.2d 663, 675, 694 P.2d 641 (1985). Here, as our equal protection analysis demonstrates, the Legislature's classification in RCW 21.20.430(7) is a rational one, related to the overall purposes of the WSSA. Plaintiffs and intervenors fail to overcome the presumption of constitutionality as required. We conclude that RCW 21.20.430(7) is not special legislation prohibited by Const. art. 2, § 28(17).

### 3. *Due Process*

Next, Intervenors argue that retroactive application of RCW 21.20.430(7) violates their state and federal due process rights. We find this argument without merit.

A claimant alleging deprivation of due process must first establish a legitimate claim of entitlement. *Meyer v. UW,* 105 Wn.2d 847, 853, 719 P.2d 98 (1986). Legitimate claims of entitlement entail vested liberty or property rights. *In re Marriage of MacDonald,* 104 Wn.2d

745, 748, 709 P.2d 1196 (1985). A claimant has no vested right in the continuation of existing statutory law. *MacDonald*, at 750. This court has held that statutory tort claim rights under Washington law are not vested absent a final, unreviewable judgment. *Seattle Rendering Works, Inc. v. Darling–Delaware Co.*, 104 Wn.2d 15, 19, 701 P.2d 502 (1985); *Johnson v. Continental West, Inc.*, 99 Wn.2d 555, 563, 663 P.2d 482 (1983); *Haddenham v. State*, 87 Wn.2d 145, 149–50, 550 P.2d 9 (1976); *Sparkman & McLean Co. v. Govan Inv. Trust*, 78 Wn.2d 584, 587, 478 P.2d 232 (1970). Moreover, property interests for federal due process purposes are not created by the United States Constitution, but instead stem from independent sources such as state law. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985).

Here, because intervenors have no claim of entitlement to the pre–amendment terms of RCW 21.20.430(7), we conclude that retroactive application of the section does not implicate any interest protected by state or federal due process guaranties.

### 4. *Separation of Powers*

Intervenors also unclearly allege separation of powers arguments as part of their due process claims. We find these arguments unpersuasive.

A statute prescribing new rules to be applied to pending litigation is generally constitutional because it does not violate the separation of powers clause. 16 C.J.S. *Constitutional Law* § 127 (1984). Separation of powers principles are violated only when the Legislature infringes on a judicial function. *See United States v. Board of Educ.*, 588 F. Supp. 132, 134 (N.D. Ill. 1984); *In re Consol. United States Atmospheric Testing Litig.*, 616 F. Supp. 759, 770–71 (N.D. Cal. 1985); *United States v. Brainer*, 691 F.2d 691, 695 (4th Cir. 1982); *United States v. Sioux Nation of Indians*, 448 U.S. 371, 402–05, 65 L. Ed. 2d 844, 100 S. Ct. 2716 (1980).

Intervenors rely on *United States v. Klein*, 80 U.S. (13

Wall.) 128, 146–47, 20 L. Ed. 519 (1871), condemning congressional attempts to alter the rule of decision in pending litigation. However, we note that courts have restricted *Klein* since it was decided over 100 years ago:

> [T]he better reading of *Klein* is quite narrow and construes the case as holding only that Congress violates the separation of powers when it presumes to dictate "how the Court should decide an issue of fact (under threat of loss of jurisdiction)" and purports "to bind the Court to decide a case in accordance with a rule of law independently unconstitutional on other grounds."

*Brainer,* at 695 (quoting P. Bator, D. Shapiro, P. Mishkin & H. Wechsler, *The Federal Courts and the Federal System* 316 n.4 (2d ed. 1973)); *In re Consol. United States Atmospheric Testing Litig.,* 820 F.2d 982, 992 (9th Cir. 1987). We find *Klein* distinguishable from the present case.

Here, the Legislature's retroactive amendment of RCW 21.20.430 does not impede upon the court's right and duty to apply new law to the facts of this case. It does not dictate how the court should decide a factual issue, nor does it affect a final judgment. Instead, the amendment is a legislative enactment of a facially neutral law for the court to apply to the facts before it. We find no violation of separation of powers principles.[1] *See In re Consol. United States Atmospheric Testing Litig., supra,* at 992 (no violation of separation of powers where act neither directs the court to make a certain finding of fact, nor requires it to apply an unconstitutional law).

### 5. *Impairment of Contracts*

Finally, plaintiffs argue that retroactive application of the RCW 21.20.430(7) scienter standard impairs their contractual right to recover for negligence under their bond contracts. They contend that because negligence was the standard of liability before the RCW 21.20.430(7) amend-

---

[1]Our analysis leads us to a contrary result to that reached by the federal district court in In re Washington Public Power Supply System Securities Litigation (W.D. Wash. Apr. 30, 1987) (MDL 551) (Order).

ment, that standard was incorporated into their bond contracts and cannot now be changed by the Legislature. We disagree.

The Washington and federal provisions forbidding impairment of contract are given similar effect. *Ruano v. Spellman,* 81 Wn.2d 820, 825, 505 P.2d 447 (1973). Both clauses forbid laws that impair the "obligation of contracts". *See* U.S. Const. art. 1, § 10; Const. art. 1, § 23. The contracts clause is applicable only if the legislative act complained of impairs a contractual relationship. *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244–45, 57 L. Ed. 2d 727, 98 S. Ct. 2716, *reh'g denied,* 439 U.S. 886 (1978). The impaired relationship must be a "contract" in the usual sense of the word "signifying an agreement of two or more minds, upon sufficient consideration, to do or not to do certain acts." *Crane v. Hahlo,* 258 U.S. 142, 146, 66 L. Ed. 514, 42 S. Ct. 214 (1922). A contract clause claim based on statutory rights succeeds only if "the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." *See United States Trust Co. v. New Jersey,* 431 U.S. 1, 17 n.14, 52 L. Ed. 2d 92, 97 S. Ct 1505, *reh'g denied,* 431 U.S. 975 (1977). The contracts clause does not prohibit the states from repealing or amending statutes generally, or from enacting legislation with retroactive effects. *United States Trust Co.,* at 17.

Here, plaintiffs argue that the negligence standard existing prior to the RCW 21.20.430(7) amendment became a part of their bond contracts because their bond purchases pursuant to the contracts were made in contemplation of existing law.

Initially, we note that in situations where statutes govern the interpretation and enforcement of private agreements, such statutes may create contractual rights because the statutes define the parties' contractual rights. *United States Trust Co.,* at 17 n.14; *Tremper v. Northwestern Mut. Life Ins. Co.,* 11 Wn.2d 461, 463–64, 119 P.2d 707 (1941) (statutory change in rule for interpreting the interest

term on life insurance policy loans would have changed the meaning of an agreed term in a life insurance contract). However, where a general statute involved provides a remedy, which is later changed, the previous remedy will not ordinarily be implied as an unexpressed term of an otherwise express contract. *See Chicago & A. R.R. v. Tranbarger*, 238 U.S. 67, 76, 59 L. Ed. 1204, 35 S. Ct. 678 (1915).

Here, the negligence standard existing prior to the RCW 21.20.430(7) amendment was part of a statutory remedy. It was not expressly incorporated as a term of the bond contract. Moreover, the negligence standard did not define any party's rights pursuant to the bond contract. Thus, the RCW 21.20.430(7) amendment requiring scienter in place of negligence did not affect, much less impair, the terms of the contract.

Nevertheless, plaintiffs contend that the subsequent amendment to require scienter diminished the value of their bonds, thus unconstitutionally impairing the force of their contracts. Plaintiffs rely on *Metropolitan Seattle v. O'Brien*, 86 Wn.2d 339, 352, 544 P.2d 729 (1976), for the proposition that an action by the State "though indirect, which diminishes the value of the contract constitutes a prohibited impairment." We disagree with plaintiffs' broad reading of *O'Brien*. In *O'Brien*, the Legislature authorized certain taxes to provide security for a city's debt service obligations pursuant to the city's issuance of bonds. *O'Brien*, at 342. This security, which substantially exceeded the actual debt requirements, was found to be an important reason for favorable bond ratings and an important factor in the bondholders' decisions to purchase the bonds. *O'Brien*, at 351. It was within this context that the court held that a state official's withholding of the funds impaired the bondholders' contract because his actions diminished the value of the bonds by affecting the security underlying them. *O'Brien*, at 352.

Here, we do not believe that the negligence standard of liability in force at the time of the bond purchases was an important reason for favorable bond ratings or an impor-

tant factor in the bondholders' decisions to purchase the bonds. Moreover, unlike the State's action in *O'Brien,* which directly affected a security pledged in the bond contract, here the Legislature's amendment of a general civil liability provision of the WSSA only changed the element of a statutory remedy that was never a part of the bond contract. We conclude that the Legislature's amendment in RCW 21.20.430(7) did not unconstitutionally impair any of plaintiffs' contractual rights.

Finally, plaintiffs contend that because RCW 21.20-.430(7) by its express terms applied only to RCW 21.20-.010(2), their negligence claims under RCW 21.20.010(3) still survive. However, plaintiffs point to no trial court ruling on this issue. Therefore, we decline to address the issue as it is not properly before the court. Overall we conclude that the trial court properly applied RCW 21.20.430(7) to require plaintiffs and intervenors to show scienter on the part of respondents coming within its terms to establish their violation of RCW 21.20.010(2).

## V
### DERIVATIVE PROFESSIONAL NEGLIGENCE AND MALPRACTICE CLAIMS

Plaintiffs and intervenors seek reversal of the trial court's dismissal of their derivative negligence and malpractice claims against respondent professionals for services rendered to the Supply System.

In a derivative suit, a stockholder asserts rights or remedies belonging to the corporation for the corporation's benefit. 12B W. Fletcher, *Private Corporations* § 5907 (1984). Such suits arise in equity to enforce a corporate right which the corporation fails, is unable, or refuses to assert by court action. *LaHue v. Keystone Inv. Co.,* 6 Wn. App. 765, 777, 496 P.2d 343 (1972); *Goodwin v. Castleton,* 19 Wn.2d 748, 761–62, 144 P.2d 725 (1944). Derivative suits are disfavored and may be brought only in exceptional circumstances. *See LaHue,* at 777. Double derivative actions usually occur when a stockholder of a parent or holding company sues to

enforce a cause of action in favor of a subsidiary company. 13 W. Fletcher, *Private Corporations* § 5977 (1984); H. Henn & J. Alexander, *Corporations* 1056 (3d ed. 1983). The ultimate beneficiary of a double derivative action is the corporation that possesses the primary right to sue. N. Lattin, *Corporations* 367–68 (1959).

## A
### Standing

Here, plaintiffs and intervenors sue through Chemical Bank, asserting its right as bond trustee to sue on the Supply System's behalf for injury resulting from the professionals' negligence. The Supply System and the respondent professionals challenge plaintiffs' and intervenors' authority to bring derivative claims. In turn, plaintiffs and intervenors challenge the Supply System's and the professionals' standing to challenge their authority. They assert that only Chemical Bank, their trustee, has standing to contest their authority to sue derivatively. They note that Chemical Bank does not challenge their authority, and has filed no brief in this appeal. We find plaintiffs' and intervenors' standing arguments unpersuasive.

⬛ Standing to challenge a derivative plaintiff's failure to comply with the procedural requirements of a derivative suit lies with the entity the plaintiff seeks to represent. *Colan v. Monumental Corp.*, 524 F. Supp. 1023, 1028 (N.D. Ill. 1981); *Prager v. Sylvestri*, 449 F. Supp. 425, 429 (S.D.N.Y. 1978); *see* Note, *Defenses in Shareholders' Derivative Suits—Who May Raise Them,* 66 Harv. L. Rev. 342, 343, 346 (1952) (proper party to invoke defense is party whom defense is designed to protect). Here, because plaintiffs' and intervenors' claims against the professionals are "double derivative" in nature, it follows that the entity they ultimately seek to represent is the Supply System, through Chemical Bank. See Brief of Appellant Haberman, at 69 (derivative claims here are by definition for benefit of Supply System). Therefore, the Supply System has standing to challenge these claims. Moreover, other courts have

granted standing to defendants other than the corporation to assert derivative plaintiffs' lack of authority to sue for failure to comply with procedural requirements. *See, e.g., Shlensky v. Dorsey*, 574 F.2d 131, 142 (3d Cir. 1978) (accountant for corporation had standing to raise plaintiffs' noncompliance with procedural requirements for derivative suit); *Dietzel v. Anger*, 8 Cal. 2d 373, 377–78, 65 P.2d 803 (1937) (defendant shareholders challenged derivative bondholder suit based on failure to meet indenture demand requirements). We conclude that respondents have standing to challenge plaintiffs' and intervenors' authority to bring these "double derivative" claims.

## B
### Equitable Stockholder Derivative Claims

To begin with, we note that plaintiffs and intervenors blur the distinction between a stockholder's equitable right to sue derivatively and a bondholder's right, which is contractual in nature. Standing to bring a stockholder derivative claim requires a proprietary interest in the corporation whose right is asserted. *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 735–36 (3d Cir. 1970), *cert. denied*, 401 U.S. 974 (1971). A creditor has no equitable standing to sue derivatively. *Dodge v. First Wis. Trust Co.*, 394 F. Supp. 1124, 1127 (E.D. Wis. 1975); *see* CR 23.1 (referring to *Stockholders'* rights to bring derivative suit). Thus, as bondholders, plaintiffs and intervenors are only creditors of the Supply System with no proprietary interest, they have no equitable right to bring derivative claims.

## C
### Bondholder Derivative Claims

Because there is no governing body of statutory or common law that protects bondholders against harmful acts by issuers except in the most extreme situations, bondholders' rights are created and protected by contracts between the bondholders and issuers. *See* American Bar Found., *Indentures* 2 (1971). These "Debenture Indentures" commonly designate a trustee to protect the bondholders' contractual

rights created pursuant to the indenture. *Indentures,* at 2, 8. Although debts created by bonds issued run directly from the issuer to the bondholders, the contractual rights conferred by indentures run from the issuer to the trustee for the bondholders' benefit. *Indentures,* at 8, 233; *see also* Note, *The Rights and Remedies of the Bondholder Under Corporate Bonds and Indentures: I,* 27 Colum. L. Rev. 443, 445 (1927).

Here, the WNP 4 and WNP 5 bonds were issued according to the authority granted the Supply System in resolution 890, an indenture agreement between the Supply System and the bondholders. Resolution 890 reflects provisions commonly contained in debenture indentures. Section 11.4 of resolution 890 authorizes the bond fund trustee, Chemical Bank, to sue on the bondholders' behalf in the event of default, and to sue on the Supply System's behalf in a derivative–type capacity upon request of a majority of the bondholders. Clerk's Papers, Second Supplemental Index, at 92, 96.

Section 11.5, a "no action" provision, precludes suit pursuant to a right created in resolution 890 unless 20 percent of the bondholders serve a formal demand upon the trustee, a reasonable time passes for the trustee to respond to the demand, and the would–be plaintiffs furnish security and indemnity to the trustee. Such "no action" provisions serve to ensure that a few bondholders take no advantage of corporate assets over other bondholders, to avoid burdensome multitudinous suits where one would suffice, and to ensure that the security of all the bondholders is not threatened by a minority action that a large majority believes hostile to its interests. *Quirke v. St. Louis–San Francisco Ry.,* 277 F.2d 705, 709–10 (8th Cir.), *cert. denied,* 363 U.S. 845 (1960); *Moore v. Tumwater Paper Mills,* 181 Wash. 45, 52–53, 42 P.2d 29, *cert. denied,* 296 U.S. 597 (1935); *Indentures,* at 232–33.

We note also that section 11.5 distinguishes between bondholder suits to enforce payment of the principal and interest on the bonds and bondholder suits pursuant to

contractual rights created in resolution 890. See resolution 890, § 11.5, Clerk's Papers, Second Supplemental Index, at 96. While the "no action" provision of section 11.5 explicitly governs all rights of action pursuant to resolution 890, it does not impair or affect the Supply System's underlying obligation for principal and interest to the bondholders, nor the bondholders' ability to enforce payment of their bonds. Resolution 890, § 11.5, Clerk's Papers, Second Supplemental Index, at 96.

Plaintiffs and intervenors contend that resolution 890's procedural restrictions do not bar their maintenance of these derivative claims because the limitations were inadequately incorporated in the bonds.

The WNP 4 and WNP 5 bonds provided that:

[R]eference [to resolution 890] is hereby made for a more complete description of the . . . remedies of the holders of the bonds with respect thereto . . .

In case an Event of Default (as defined by resolution 890) shall occur, the principal of the bonds . . . at such time outstanding may be declared due and payable by the Bond Fund Trustee or by the holders of 20% in principal amount of such Bonds . . . but such declaration may, under certain circumstances, be annulled.

Clerk's Papers, at 3219, 3221.

Where bonds contain no restriction, either directly or by reference, against an action on them, a holder may maintain a separate action without reference to the provisions of an indenture regardless of the restrictions which might otherwise be binding. *See Snyder v. Yakima Fin. Corp.*, 174 Wash. 499, 508, 25 P.2d 108 (1933). In *Snyder*, however, the bonds contained *no* reference to restrictions on bondholders' rights to sue. *Snyder*, at 508. In cases where the bonds refer to the indenture agreement, bondholders are bound by the terms of the indenture. *See Colsky v. Eyres Storage & Distrib. Co.*, 178 Wash. 404, 407, 34 P.2d 1114 (1934). Plaintiffs and intervenors cite other decisions holding that passing reference to an indenture cannot restrict bondholders' rights to sue if the bond is not paid at maturity. Plaintiffs and intervenors ignore the distinction

between restrictions placed on rights created by the indenture contract, *e.g.,* derivative authority, and rights existing apart from the contract, *e.g.,* right to enforce debt owed. Indeed, in *all* of the cases cited, unlike the present derivative action for negligence, the indenture involved restricted the bondholders' rights to collect interest or principal when due. *See, e.g., Guardian Depositors Corp. v. David Stott Flour Mills, Inc.,* 291 Mich. 180, 185, 289 N.W. 122 (1939); *Scott v. Platt,* 171 Or. 379, 391, 135 P.2d 769, 775, 137 P.2d 975 (1943). *Bank of Cal. v. National City Co.,* 138 Wash. 517, 524, 244 P. 690, *rev'd on other grounds on rehearing,* 141 Wash. 243, 251 P. 561 (1926); *Friedman v. Airlift Int'l, Inc.,* 44 A.D.2d 459, 355 N.Y.S.2d 613, 614–15 (1974) (expressly distinguishing incorporation by reference of restrictions on suit for interest owed from incorporation by reference of a special collection right created by indenture). Here, the face of the WNP 4 and WNP 5 bonds referred readers to resolution 890 for a complete description of the remedies available to bondholders. A bondholder would necessarily look to the resolution to determine whether derivative rights existed, and would also discover restrictions on any such right created. Thus, the present case is distinguishable from situations where a bondholders' right to sue for principle and interest owed is involved. Moreover, resolution 890 was properly incorporated in the bonds.

Plaintiffs also argue that they are not bound by resolution 890 because they were induced to become parties to it by untrue statements and omissions of material facts in the Official Statements. However, no allegations of misstatements in resolution 890 are made in plaintiffs' complaint. In any event, misstatements in the Official Statements are not relevant to whether the WNP 4 and WNP 5 bonds adequately notified bondholders of the rights and restrictions created by resolution 890. Here, we find that the bonds gave bondholders notice of resolution 890, and thus that plaintiffs are bound by its terms. We therefore decline to reform the clear terms of resolution 890.

We also reject intervenors' attempt to sue in place of Chemical Bank pursuant to the language in the bonds giving holders of 20 percent in principal amount of the bonds the right to declare the bonds due upon default. Intervenors' derivative claims do not seek to declare the bonds due, but rather are for negligence and malpractice against professionals not parties to the bonds.

We conclude that plaintiffs' and intervenors' derivative negligence claims are governed by resolution 890, and the demand requirements of section 11.5.

Alternatively, plaintiffs and intervenors assert that they were excused from the resolution 890 demand requirements. First, they argue that any demand on Chemical Bank would have been futile because they were not allowed to intervene in *Chemical Bank* II and because Chemical Bank has not supported them in their attempts to bring these derivative claims. They also contend that Chemical Bank waived the demand requirements by failing to object to this action.

Few cases address the issue of whether and when a bondholder must comply with indenture demand requirements in indentures authorizing a trustee to sue derivatively in place of the corporation. *But see Quirke v. St. Louis–San Francisco R.R., supra* at 709 (upholding similar no action clause). However, cases interpreting Fed. R. Civ. P. 23.1, requiring shareholders to demand that the corporation sue before suing derivatively, provide guidance by analogy. The Fed. R. Civ. P. 23.1 demand requirement is intended to allow the corporation an opportunity to take over a suit brought on its behalf. *Lewis v. Graves,* 701 F.2d 245, 247 (2d Cir. 1983). Whether the demand requirement is excused is within the trial court's discretion. *DePinto v. Provident Sec. Life Ins. Co.,* 323 F.2d 826, 830 n.7 (9th Cir. 1963), *cert. denied,* 376 U.S. 950 (1964); 3B J. Moore, *Federal Practice* ¶ 23.1.19, at 23.1–83 (1987). Thus, a trial court's determination of whether demand requirements are excused will only be reversed for a manifest abuse of discretion. *Lewis,* at 248.

The doctrine of futility excuses demand on directors when the majority of the directors are the alleged wrongdoers. Note, *Demand on Directors and Shareholders as a Prerequisite to a Derivative Suit*, 73 Harv. L. Rev. 746, 753 (1960); 3B J. Moore, *Federal Practice* ¶ 23.1.19, at 23.1–87, –89 (1987); *see, e.g., Jannes v. Microwave Communications, Inc.*, 57 F.R.D. 18, 21 (N.D. Ill. 1972); *First Wis. Nat'l Bank v. Brynwood Land Co.*, 245 Wis. 610, 15 N.W.2d 840 (1944) (demand upon bondholders futile because majority bondholders were engaged in acts giving rise to action); *GE Co. v. Bucyrus–Erie Co.*, 563 F. Supp. 970, 974 (S.D.N.Y. 1983); *Clark v. Lomas & Nettleton Fin. Corp.*, 625 F.2d 49, 53–54 (5th Cir.), *reh'g denied*, 632 F.2d 894 (1980), *cert. denied*, 450 U.S. 1029 (1981); *Clay v. Selah Vly. Irrig. Co.*, 14 Wash. 543, 548–49, 45 P. 141 (1896) (bondholders excused from notice where corporation conspired with trustee to dispose of property contrary to deed provisions and deceived them as to amount due on mortgage). However, it is well established that futility is not established by mere approval or acquiescence by a corporation. *Kaufman v. Safeguard Scientifics, Inc.*, 587 F. Supp. 486, 489 (E.D. Pa. 1984); *Lewis v. Graves*, 701 F.2d at 248. Finally, courts may excuse demand upon a trustee when the trustee is involved in a lawsuit arising out of the same facts asserting the same claims as the bondholders' claims. *Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1539 n.2 (S.D.N.Y. 1983) (trustee intervened in bondholder suit rendering demand irrelevant); *Campbell v. Hudson & Manhattan R.R.*, 277 A.D. 731, 102 N.Y.S.2d 878, 882, *aff'd*, 302 N.Y. 902 (1951) (trustee's complaint urged that court grant relief requested by plaintiffs); *see Thornton v. Evans*, 692 F.2d 1064, 1080 (7th Cir. 1982) (court excused demand because trustees had notice of claims; trustees filed identical suit to beneficiaries' but failed to name certain defendants who breached trust).

Here, demand on Chemical Bank was not excused on the basis of futility. Chemical Bank is not the target of plaintiffs' and intervenors' allegations of negligence. Moreover,

Chemical Bank's failure to sue the professionals does not excuse the demand requirements because Chemical Bank had no reason to take action. As noted by Chemical Bank's attorney at trial, "nobody has moved against us or we have not moved against anyone. So there's no reason for us to take a position." Report of Proceedings vol. II, at 9. Likewise, Chemical Bank's failure to support plaintiffs' intervention in *Chemical Bank* II does not excuse demand. No claims against respondent professionals were involved there, and this court will not presume that Chemical Bank knew of any alleged negligence or malpractice.

Next, plaintiffs and intervenors contend that formal demand, by 20 percent of the bondholders should be excused because to do so would be too costly. This argument is without merit. We note that shareholders may be excused from serving demand on other shareholders as required by Fed. R. Civ. P. 23.1 when onerous expense is involved. *Messinger v. United Canso Oil & Gas Ltd.*, 80 F.R.D. 730, 738 (D. Conn. 1978); *Levitt v. Johnson*, 334 F.2d 815, 818 (1st Cir. 1964), *cert. denied*, 379 U.S. 961 (1965). However, locating 20 percent of the bondholders presents no onerous expense here because nearly 20 percent of the bondholders are already parties to this action. See Brief of Appellant Haberman, at 74; Brief of Intervenors, at 104.

Finally, plaintiffs argue that demand should be excused because the statute of limitations has run against the Supply System for its choses in action against the professionals for negligence. Plaintiffs contend that these actions will be lost if this court upholds the dismissal of these derivative claims.

At least one court has noted that a factor in determining whether shareholders are excused from Fed. R. Civ. P. 23.1 demand requirements is if a limitations period might run in the time necessary to serve such a demand. *Levitt*, at 817. However, whether a demand is excused because a limitations period will run is gauged at the time the action is commenced, not afterward with the benefit of hindsight.

*Lewis v. Graves,* 701 F.2d at 250. Here, at the time plaintiffs and intervenors commenced this action in 1985, the statute of limitations had not yet run. Therefore, demand could have been served in 1985 to preserve these choses in action. Because excuse is measured at that time, plaintiffs and intervenors cannot be excused from demand requirements on this basis.

We conclude that plaintiffs' and intervenors' double derivative claims against respondent professionals for negligence and malpractice were properly dismissed by the trial court. The claims are governed by the terms of resolution 890 and plaintiffs and intervenors have failed to meet the demand requirements contained in section 11.5. Because we determine that plaintiffs and intervenors have not met the procedural prerequisites to their claims, we need not address their substantive derivative claims against respondent professionals for malpractice and negligence.

### D
### Equitable Creditor Claims

Plaintiffs also allege their derivative claims as equitable creditors of the Supply System. They contend that the Supply System's rights of action against the respondent professionals constitute equitable assets recoverable by the creditor–bondholders to satisfy debts represented by the bonds.

Such "creditor suits" are brought to compel the discovery and application of equitable assets or property to the payments of debts. However, "a general creditor with a mere legal demand may not, in the absence of statutory authorization, come into equity to collect his claim." 21 C.J.S. *Creditors' Suits* § 43 (1940). The debt must be reduced to judgment before an equitable creditor action can be brought. *Hamburger Apparel Co. v. Werner,* 17 Wn.2d 310, 317, 322, 135 P.2d 311 (1943); *see Woody's Olympia Lumber, Inc. v. Roney,* 9 Wn. App. 626, 513 P.2d 849 (1973) (allowing attachment of debtor's tort action after creditor's claim reduced to judgment).

Here, the trial court dismissed plaintiffs' claims as inadequately pleaded. Notwithstanding the pleadings, we hold that plaintiffs' equitable creditor claims fail for want of a judgment. The trial court properly dismissed all derivative claims.

## VI
### NEGLIGENT MISREPRESENTATION AND FRAUD

The trial court dismissed intervenors' common law fraud and negligent misrepresentation claims against all respondents. The trial court concluded that intervenors' claims were barred by principles of discretionary immunity, the public duty doctrine, and sovereign immunity as applied to out–of–state respondents through choice of law rules. The trial court alternatively held that intervenors' negligent misrepresentation claims against the respondent professionals failed for lack of duty. Intervenors contend that their claims are not barred by immunity, and that their claims were alleged sufficiently to state claims for fraud and negligent misrepresentation against respondent professionals. We agree.

## A
### Discretionary Immunity

Discretionary immunity is a narrow court–created exception to the Legislature's abolition of sovereign immunity. *Bender v. Seattle,* 99 Wn.2d 582, 587, 664 P.2d 492 (1983); *Evangelical United Brethren Church v. State,* 67 Wn.2d 246, 255, 407 P.2d 440 (1965). Discretionary immunity serves to assure that courts refuse to pass judgment on policy decisions in the province of coordinate branches of government. *Bender,* at 588; *King v. Seattle,* 84 Wn.2d 239, 246, 525 P.2d 228 (1974). To be protected by such immunity, an act, omission, or decision must involve an exercise of basic policy evaluation, judgment and expertise by the governmental agency involved. *Evangelical United Brethren Church,* at 255. The activity must involve basic policy discretion rather than the implementation of policy. *Mason v. Bitton,* 85 Wn.2d 321, 327–29, 534 P.2d 1360 (1975);

*Bender,* at 588–90. Thus, only "high level discretionary acts exercised at a truly executive level" are protected. *Bender,* at 588.

Arguably, the Supply System's decision to build the WNP 4 and WNP 5 is immune as a discretionary act. However, intervenors challenge the means by which that decision was carried out. Intervenors allege that respondents made fraudulent statements and omissions, which were used in the Official Statements and Annual Reports by the Supply System to sell bonds to finance the project. Thus, the acts complained of by intervenors do not involve discretionary acts, or policy decisions by the Supply System; rather they involve the mechanism by which the Supply System implemented its decision to build the project. As a result, discretionary immunity does not bar intervenors' fraud claims. *See Miotke v. Spokane,* 101 Wn.2d 307, 337, 678 P.2d 803 (1984) (decision to build sewage bypass was not a basic policy decision protected by discretionary immunity because the decision was based on technical engineering and scientific judgment); *Stewart v. State,* 92 Wn.2d 285, 294, 597 P.2d 101 (1979) (decision to build a freeway was a basic policy decision, but its design and lighting was not protected by discretionary immunity). *Algona v. Pacific,* 35 Wn. App. 517, 520, 667 P.2d 1124, *review denied,* 100 Wn.2d 1028 (1983) (municipality furnishing sewer facilities functioning in proprietary capacity and not immune to suit).

### B
### Public Duty Doctrine

The public duty doctrine determines the scope of duty involved where public services are provided. *J & B Dev. Co. v. King Cy.,* 100 Wn.2d 299, 303, 669 P.2d 468, 41 A.L.R.4th 86 (1983). The doctrine limits governmental liability arising out of its provision of public services to breach of a duty owed specifically to one plaintiff, rather than the public generally. *J & B Dev. Co.,* at 303–05.

Here, intervenors' allegations of fraud do not arise out of

a service to the general public. Instead, they involve alleged fraud in the course of raising private funds for public use. Moreover, the Supply System issued its statements and reports pursuant to the securities laws, not a general public duty. We conclude that the public duty doctrine is inapplicable to this case.

## C
### Sovereign Immunity

The trial court also held that intervenors' common law fraud claims against respondent Oregon and Idaho Utilities were barred by Oregon and Idaho sovereign immunity principles. We disagree.

Resolution 890, pursuant to which the Oregon and Idaho Utilities entered into the Participants' Agreements, provides that the resolution and the bonds be construed and governed by Washington law. Resolution 890, § 14.11. Although a choice of law provision in a contract does not govern tort claims arising out of the contract, it may be considered as an element in the most significant relationship test used in tort cases. *See Kammerer v. Western Gear Corp.*, 96 Wn.2d 416, 423, 635 P.2d 708 (1981).

When faced with claims of other states' immunity, this court uses the most significant relationship test, then evaluates the policies behind the interested states whose policies conflict. *Johnson v. Spider Staging Corp.*, 87 Wn.2d 577, 582, 555 P.2d 997 (1976); *Southwell v. Widing Transp., Inc.*, 101 Wn.2d 200, 204, 676 P.2d 477 (1984); *see also Biscoe v. Arlington Cy.*, 738 F.2d 1352, 1359 (D.C. Cir. 1984) (states faced with claims of immunity by sister states have resolved the issue by reference to the forum state's policy on comity, not by rigid application of choice of law rules), *cert. denied,* 469 U.S. 1159 (1985). The elements of the significant relationship test include: (a) the place of injury; (b) the place where the conduct causing the injury occurred; (c) the residence of the parties; and (d) the place where the relationship is centered. Restatement (Second) of Conflict of Laws § 145 (1971).

Here, the most significant relationship is with Washington. A significant number of the parties to this action are Washington residents. The fraudulent acts occurred here where the Supply System, and thus the relationship is centered. Moreover, the planning of the project, the issuance of bonds, and the rendering of allegedly fraudulent services occurred here. Finally, the statements and reports containing the injurious misrepresentations originated in Washington. See also section IV(D).

The policies of the states involved also dictate our application of Washington law. Oregon and Idaho Utilities claim that sovereign immunity reflects their states' interests in protecting their public fisc and ability to govern their operations. On the other hand, the Washington Legislature waived sovereign immunity to discourage tortious governmental conduct, and to hold government responsible for its acts. *Bender v. Seattle, supra* at 590. We believe our application of Washington law here furthers the Washington Legislature's purpose without interfering with Oregon's or Idaho's ability to govern. Our decision recognizes this State's policy of holding government accountable for tortious conduct and only applies to Oregon and Idaho respondents to the extent they acted tortiously in Washington.

Respondents also argue that full faith and credit and comity require that we apply Oregon and Idaho sovereign immunity principles. We disagree.

Full faith and credit does not require a forum state to respect another state's rule on sovereign immunity unless the other state's ability to govern would be threatened. *Nevada v. Hall,* 440 U.S. 410, 424 n.24, 59 L. Ed. 2d 416, 99 S. Ct. 1182, *reh'g denied,* 441 U.S. 917 (1979); *see Mianecki v. Second Judicial Dist. Court,* 99 Nev. 93, 96, 658 P.2d 422, *cert. dismissed,* 464 U.S. 806 (1983). Moreover, the doctrine of comity is not a rule of law, but one of practice, convenience and expediency. *Mast, Foos & Co. v. Stover Mfg. Co.,* 177 U.S. 485, 488, 44 L. Ed. 856, 20 S. Ct. 708 (1900). Comity allows the courts of one jurisdiction to

give effect to laws of another jurisdiction out of deference and respect, considering the interests of each state. *Mianecki*, at 97. The decision to invoke comity is within the court's discretion. *Mianecki*, at 98. *Smith v. Fletcher*, 102 Wash. 218, 222, 173 P. 19 (1918). Comity does not preclude one state from exercising jurisdiction over another state because of that state's sovereign immunity, especially over claims arising out of securities purchases. *Ehrlich–Bober & Co. v. University of Houston*, 49 N.Y.2d 574, 583, 404 N.E.2d 726, 427 N.Y.S.2d 604 (1980) (any other rule would burden financial institutions with reviewing the laws of every jurisdiction before consenting to do business with any agency of a state).

We conclude that Washington law applies and that the Oregon and Idaho Utilities are not immune to intervenors' common law claims. Therefore, we reverse the trial court's ruling that intervenors' claims are barred by immunity principles.

## D
## Intervenors' Negligent Misrepresentation Claims Against Professionals

The trial court alternatively dismissed intervenors' claims against the professionals on the basis that the professionals owed no duty beyond that owed to their individual client, the Supply System. We disagree. Intervenors alleged that respondent professionals made and participated in making negligent misrepresentations of fact in the Official Statements and Annual Reports, and negligently omitted facts necessary to make the statements and reports not misleading. Intervenors further alleged that they suffered pecuniary loss in reliance on the information contained, or not contained, in the statements and reports.

To determine whether a plaintiff has stated a claim for negligent misrepresentation, this court adheres to the standards in the Restatement (Second) of Torts § 552(1), (2) (1977) which provides:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he

has a pecuniary interest, supplies false information for
the guidance of others in their business transactions, is
subject to liability for pecuniary loss caused to them by
their justifiable reliance upon the information, if he fails
to exercise reasonable care or competence in obtaining or
communicating the information.

(2) Except as stated in Subsection (3), [which pertains
to the liability of one who is under a public duty to fur-
nish such information] the liability stated in Subsection
(1) is limited to loss suffered

(a) by the person or one of a limited group of persons
for whose benefit and guidance he intends to supply the
information or knows that the recipient intends to supply
it; and

(b) through reliance upon it in a transaction that he
intends the information to influence or knows that the
recipient so intends or in a substantially similar transac-
tion.

*Transamerica Title Ins. Co. v. Johnson,* 103 Wn.2d 409,
415–16, 693 P.2d 697 (1985); *Wilbur v. Western Properties,*
22 Wn. App. 458, 463, 589 P.2d 1273 (1979).

In deference to legitimate fears of indeterminate liability
to third persons, the Restatement narrows the scope of an
action for negligent misrepresentations. Liability does not
extend to every person who ultimately becomes aware of
the misstatement. Instead, because of the "important social
policy of encouraging the flow of commercial information
upon which the operation of the economy rests", the
defendant must be "manifestly aware of the use to which
the information was to be put and intended to supply it for
that purpose." Restatement (Second) of Torts § 552, com-
ment *a* (1977). Indeed, "[w]hen there is no intent to deceive
but only good faith coupled with negligence, the fault of the
maker of the misrepresentation is sufficiently less to justify
a narrower responsibility for its consequences." Restate-
ment (Second) of Torts § 552, comment *a*. Liability for
negligent misrepresentations is thus limited to cases where
(1) the defendant has knowledge of the specific injured
party's reliance; or (2) the plaintiff is a member of a group
that the defendant seeks to influence; or (3) the defendant

has special reason to know that some member of a limited group will rely on the information. *See Chubb Group of Ins. v. C.F. Murphy & Assocs.*, 656 S.W.2d 766 (Mo. Ct. App. 1983). However,

> it is not necessary that the maker should have any particular person in mind as the intended, or even the probable, recipient of the information. In other words, it is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied. It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it. It is enough, likewise, that the maker of the representation knows that his recipient intends to transmit the information to a similar person, persons or group. It is sufficient, in other words, insofar as the plaintiff's identity is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given.

Restatement (Second) of Torts § 552, comment *h* (1977).

Here, the trial court's CR 12(b)(6) dismissal of intervenors' misrepresentation claims must be reversed. Assuming intervenors' allegations to be true, and considering all conceivable facts in support of them, we cannot say that intervenors have failed to state a claim. *See Lawson v. State,* 107 Wn.2d 444, 448, 730 P.2d 1308 (1986).

Intervenors specifically allege that respondent professionals negligently supplied information to the Supply System, and that the information appeared in the Official Statements and Annual Reports relied upon by intervenors in their decisions to purchase the bonds. As a result of their reliance, intervenors allege pecuniary loss. Additionally, intervenor Amexco alleges that several respondent professionals made personal visits and telephone calls on several

occasions to discuss the bonds. Respondents contend that this court should not consider these allegations because they did not appear in intervenors' first amended complaint, and because the telephone calls were raised for the first time on this appeal. However, bound by the CR 12(b)(2) standard of review here, we consider these allegations as hypothetical facts forming a viable conceptual background for the alleged negligent misrepresentations made by respondent professionals. *See Halvorson v. Dahl,* 89 Wn.2d 673, 674–75, 574 P.2d 1190 (1978).

Moreover, it is conceivable that each of the respondent professionals were told by the Supply System of its intent to supply information received from the professionals directly to institutional investors such as the intervenors, either specifically, or as a limited class to induce them to purchase bonds. In such circumstances, intervenors would be part of a limited group which the professionals knew would receive their information and rely on it in making a decision to purchase bonds. Conceivably, the professionals could have intended that intervenors, as institutional investors, benefit from the information so as to induce them to purchase bonds, resulting in favorable bond sales and pecuniary gain to the professionals.

However, because the trial court dismissed intervenors' allegations on the pleadings, we have no factual basis from which to discern respondent professionals' knowledge or intentions. Because this information is necessary to a *determination of whether a duty exists to intervenors for* alleged misrepresentations, we must remand to the trial court for further factual determinations.

### E
### Intervenors' Common Law Fraud Claims

In addition to their negligent misrepresentation claims, intervenors also allege fraudulent misrepresentation by all respondents in the Official Statements and Annual Reports.

Respondents first argue that intervenors failed to plead fraud with particularity as required by CR 9(b). The trial

court did not decide this issue, but noted that any deficiencies could be cured by a motion for more definite statement. Report of Proceedings vol. III, at 16. Nevertheless, respondents argue that: (1) no allegations that any respondent other than the Supply System supplied information to them appear within intervenors' complaint; (2) intervenors fail to set forth the allegedly fraudulent acts by each respondent; and (3) the allegations in the complaint are too general.

CR 9(b) requires dismissal when a complaint fails to plead fraud with particularity. CR 9(b), like its federal counterpart, Fed. R. Civ. P. 9(b), ensures that plaintiffs seek redress for a wrong rather than use lawsuits as pretexts to discover unknown wrongs, protects defendants from unnecessary harm to their reputation, and gives defendants sufficient notice to enable them to prepare a defense. *See D & G Enters. v. Continental Ill. Nat'l Bank & Trust Co.,* 574 F. Supp. 263, 266–67 (N.D. Ill. 1983); *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir. 1985). The complaining party must plead both the elements and circumstances of fraudulent conduct. 3A L. Orland, Wash. Prac. 129 (3d ed. 1980). Applying CR 9(b) in light of CR 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief", a complaint must allege specific fraudulent acts, but need not plead evidentiary matters. *See D & G Enterprises,* at 267; *Trak Microcomputer Corp. v. Wearne Bros.,* 628 F. Supp. 1089, 1092 (N.D. Ill. 1985); *Somerville v. Major Exploration, Inc.,* 576 F. Supp. 902, 909 (S.D.N.Y. 1983).

To determine whether allegations of fraud satisfy CR 9(b), the court will consider only the complaint, and not additional allegations made in the briefs. *See Beck v. Cantor, Fitzgerald & Co.,* 621 F. Supp. 1547, 1552 (N.D. Ill. 1985). A complaint adequately alleges fraud if it informs the defendant of who did what, and describes the fraudulent conduct and mechanisms. *Beck,* at 1552 n.3; *Lewis v. Berry,* 101 F.R.D. 706, 708–09 (W.D. Wash. 1984). If a complaint provides this information, then group conduct

may be pleaded generally because the defendants have sufficient information to answer the allegations. *In re Equity Funding Corp. of Am. Sec. Litig.*, 416 F. Supp. 161, 181 (C.D. Cal. 1976). "[W]hen a plaintiff sues individual group members on the basis of the collective product of the group, specific allegations about the role of each defendant are unnecessary." *In re Consumers Power Co. Sec. Litig.*, 105 F.R.D. 583, 593 (E.D. Mich. 1985).

Here, intervenors' complaint specifies the allegedly fraudulent information supplied or omitted by each respondent to the Supply System, the individual respondent compiling and disseminating this information, and what statements were in the Official Statements and Annual Reports. Clerk's Papers, at 640–53; First Amended Complaint, paras. 12–57. Intervenors' complaint then alleges the elements of fraud based on the assertions made in, or omitted from, the Official Statements and Annual Reports. Clerk's Papers, at 692–94; First Amended Complaint, paras. 195–201. Although the pleadings do not set forth circumstances illustrating respondents' knowledge of their misrepresentations (scienter), CR 9(b) specifies that knowledge may be averred generally. Therefore, as intervenors' complaint gave respondents sufficient notice of the allegations to allow them to prepare their answer and defense, we conclude that intervenors' complaint satisfies the CR 9(b) particularity requirement as to their fraud claims.

Respondents next argue that they owed no duty to intervenors in the absence of privity or a fiduciary relationship. They point out that no respondent other than the Supply System represented anything directly to the bondholders in the Official Statements and Annual Reports.

While Washington cases allowing recovery for fraud generally involve privity or fiduciary relationships between the parties, allegations of fraud may be asserted where one party to a transaction has a duty to speak because that party possesses superior knowledge yet that party fails to state, or has no basis for, an asserted material fact. *See, e.g., Lincoln v. Keene*, 51 Wn.2d 171, 174, 316

P.2d 899 (1957); *Hamilton v. Mihills,* 92 Wash. 675, 680, 159 P. 887 (1916); *Kaas v. Privette,* 12 Wn. App. 142, 149, 529 P.2d 23 (1974).

Other courts have held defendants liable for concealment or misstatements absent privity when the defendant knows that information will be passed on to the plaintiff or to a class of person who the defendant intends to induce reliance. *See, e.g., Fischer v. Kletz,* 266 F. Supp. 180, 187 (S.D.N.Y. 1967) (where affirmative misrepresentation was involved, accountant was liable regardless of his interest in the transaction); *Bank of Vly. v. Mattson,* 215 Neb. 596, 597–98, 339 N.W.2d 923 (1983) (borrower's fraudulent misrepresentations regarding his finances made to second party constituted fraud on third party plaintiff who was approached by second party to raise money for borrower).

Additionally, while requiring privity, a fiduciary relationship, or a limited class is warranted in negligent misrepresentation cases where a defendant is merely negligent and should not be held potentially liable to an unlimited number of plaintiffs, the same reasoning does not apply where a defendant knowingly makes a misrepresentation.

The Restatement (Second) of Torts provides:

> One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons *whom he intends or has reason to expect to act or to refrain from action* in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.

(Italics ours.) Restatement § 531.

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, *is made to a third person and the maker intends or has reasons to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction* or type of transaction involved.

(Italics ours.) Restatement § 533.

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) matters known to him that he knows to be *necessary to prevent his partial or ambiguous statement of the facts from being misleading;* and

. . .

(e) *facts basic to the transaction,* if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, *would reasonably expect a disclosure of those facts.*

(Italics ours.) Restatement § 551. Thus, while a duty in a fraud case may be owed by a defendant to plaintiffs in privity, a fiduciary relationship, or a limited class of persons, a duty may also arise to those third persons whom the defendant intends or has reason to expect will receive the information, especially in a business transaction where a defendant has knowledge necessary to prevent misrepresentation, or facts basic to the transaction where the plaintiff would reasonably expect disclosure.

Here, with the trial court's CR 12(b)(6) dismissal in mind, we assume that respondents gave information to the Supply System knowing or intending that the Supply System would pass the information onto the intervenors in the Official Statements and Annual Reports. The respondents also have superior knowledge of facts basic to the transaction which they knew or reasonably should have expected intervenors to expect disclosure. Thus, respondents may

have owed a duty to intervenors even absent privity or a fiduciary relationship.

## VII
### CONSUMER PROTECTION ACT CLAIMS

Intervenors challenge the trial court's dismissal of their Consumer Protection Act (CPA), RCW 19.86, claims against respondent professionals, irrigation districts and rural electric cooperatives. Intervenors concede that the remaining respondents are exempt from the CPA as municipal corporations or political subdivisions of the state. *See Washington Natural Gas Co. v. PUD 1,* 77 Wn.2d 94, 98, 459 P.2d 633 (1969).

### A
### Respondent Professionals

■■■ The trial court held that intervenors' allegations of unfair and deceptive acts or practices in connection with the sale of bonds by respondent professionals failed to state a claim under the CPA as interpreted by this court in *Short v. Demopolis,* 103 Wn.2d 52, 61, 691 P.2d 163 (1984). In *Short,* this court held that the term "trade or commerce" used by the CPA only includes the entrepreneurial or commercial aspects of the professional practice of law, not the substantive quality of services provided. Claims "directed to the competence of and strategy employed" by attorneys constitute allegations of negligence or malpractice in performing professional services and, as such, are not actionable under the CPA. *Short,* at 61.

Intervenors do not dispute that *Short* is applicable to the respondent professionals here. Rather, the intervenors contend that their claims amount to allegations of unfair or deceptive acts in the entrepreneurial aspects of the professionals' businesses. We disagree.

Intervenors allege that all professionals rendered services negligently to the Supply System. The intervenors do not challenge the professionals' fee rates, billing or client relationships. We conclude that because intervenors' allege only

negligence or malpractice against the respondent professionals, they do not state a claim under the CPA. Intervenors' bald assertions that the respondent investment advisors were, by definition, engaged in entrepreneurial aspects of their business are without merit. In their professional malpractice claims against the respondent advisors, intervenors attack the advisors' exercise of professional judgment, not the entrepreneurial aspects of their services. Therefore, we affirm the trial court's dismissal of intervenors' CPA claims against respondent professionals.

## B
### Irrigation Districts

Intervenors claim that because respondent irrigation districts perform no governmental functions, they are not municipal corporations exempt from the CPA. Intervenors rely on *State v. Human Relations Research Found.*, 64 Wn.2d 262, 266, 391 P.2d 513 (1964). In *Human Relations,* however, the question whether an irrigation district was a municipal corporation was not before the court; rather, the court was faced with the issue of the district's interest in compensation for state condemnation of its land. In this context the court reasoned that the district was entitled to compensation for the condemnation because it performed no governmental function. *Human Relations,* at 266.

Other cases hold that irrigation districts are undeniably municipal corporations created by the Legislature for a public purpose. *See State ex rel. Clancy v. Columbia Irrig. Dist.,* 121 Wash. 79, 84, 208 P. 27 (1922); *In re Columbia Irrig. Dist.,* 183 Wash. 425, 437, 48 P.2d 648 (1935); *Outlook Irrig. Dist. v. Fels,* 176 Wash. 211, 219, 28 P.2d 996 (1934); *Washington Nat'l Inv. Co. v. Grandview Irrig. Dist.,* 175 Wash. 644, 648, 28 P.2d 114 (1933); *Roberts v. Richland Irrig. Dist.,* 169 Wash. 156, 160, 13 P.2d 437 (1932), *aff'd,* 289 U.S. 71 (1933); *Richland Irrig. Dist. v. De Bow,* 149 Wash. 242, 246, 270 P. 816 (1928); *Burbank Irrig. Dist. 4 v. Douglass,* 143 Wash. 385, 396, 255 P. 360, 259 P. 881 (1927); *Peters v. Union Gap Irrig. Dist.,* 98 Wash. 412,

414, 167 P. 1085 (1917); *Brown Bros. v. Columbia Irrig. Dist.*, 82 Wash. 274, 283–84, 144 P. 74 (1914); *Roza Irrig. Dist. v. State*, 80 Wn.2d 633, 634, 497 P.2d 166 (1972). Therefore, we conclude that respondent irrigation districts are municipal corporations and, as such, are exempt from the CPA under *Washington Natural Gas Co. v. PUD 1, supra* at 98.

## C
### Rural Electric Cooperatives

Intervenors take exception to the trial court's conclusion that because rural electric cooperatives are otherwise regulated, they are exempt from the CPA. The CPA exempts "transactions permitted by any other regulatory body". RCW 19.86.170. *See Tokarz v. Frontier Fed. Sav. & Loan Ass'n*, 33 Wn. App. 456, 464 n.5, 656 P.2d 1089 (1982). The Rural Electrification Administration (REA), a federal agency, closely monitors and extensively controls the acts of rural electric associations borrowing money from the REA. *In re Dairyland Power Coop.*, 37 F.P.C. 12, 18 (1967). Here, however, the record contains no assertion that any of the respondent electrical associations were Administration borrowers and therefore subject to such control by the REA.

Nevertheless, as the rural electric cooperatives, like the respondent PUD's and municipal utilities, are non-profit, consumer–owned utilities serving those who reside within their service areas, there exists no public policy reason as expressed by the CPA why the cooperatives should not be likewise exempt from the CPA. Moreover, these entities allegedly violated the CPA only by virtue of their relationship with the Supply System, which is exempt from the CPA. We conclude that to subject the respondent rural electric cooperatives to potential CPA liability would be contrary to the Legislature's purpose in excluding municipal corporations from liability under the CPA. Therefore, we hold in light of the unique facts of this case that, like the Supply System and other governmental entities admittedly exempt from the CPA, respondent rural electric cooperatives are also exempt from the CPA under our rea-

soning in *Washington Natural Gas Co. v. PUD 1, supra* at 98. We affirm the trial court's dismissal of intervenors' CPA claims against respondents.

# VIII
## AMENDMENT OF COMPLAINT

Although plaintiffs agree with the trial court's ruling allowing them to amend their original complaint to add new plaintiffs, they challenge the trial court's refusal to allow those new plaintiffs' claims to relate back to the original filing date for statutes of limitation purposes.

Respondents argue, and the trial court held, that CR 15(c) applies only to the relation back of claims against newly added defendants, not newly added plaintiffs. We disagree.

CR 15(c) provides:

> **(c) Relation Back of Amendments.** Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.

The advisory committee note to Fed. R. Civ. P. 15(c) from which CR 15(c) was derived, states that rule 15(c) extends by analogy to plaintiffs. *See* Advisory Committee Note to the 1966 amendment to rule 15(c), 39 F.R.D. 82–84 (1966); 3 J. Moore, *Federal Practice* ¶ 15.15[4.–2], at 15–169 (2d ed. 1985); 6 C. Wright & A. Miller, *Federal Practice* § 1501, at 524 (1971). We find these comments persuasive.

Respondents argue that to allow new plaintiffs'

claims to relate back in this case would amount to granting them a new cause of action after the applicable statutes of limitations had run. Since the amendment of CR 15(c), however, we have rejected this argument. Indeed, once the notice and prejudice requirements of CR 15(c) have been met, any amendment does not subvert the policies of the statute of limitations. *North St. Ass'n v. Olympia,* 96 Wn.2d 359, 368, 635 P.2d 721 (1981). "Rule 15(c), as amended, dovetails with the policies of the limitation statutes." *North St. Ass'n,* at 368. Moreover, "[a]s long as a defendant is fully apprised of a claim arising from specific conduct and has prepared to defend the action against him, he will not be prejudiced by the addition of a new plaintiff and thus should not be allowed to raise a limitations defense." 6 C. Wright & A. Miller, *Federal Practice* § 1501, at 272 (Supp. 1986).

Thus, we conclude that the notice and prejudice principles contained in CR 15(c) extend by analogy to the relation back of amendments adding new plaintiffs. Thus, a court must determine whether the requirements of CR 15(c) are met and the court must determine whether failure to join the plaintiffs earlier was the result of inexcusable neglect. *See South Hollywood Hills Citizens Ass'n v. King Cy.,* 101 Wn.2d 68, 77, 677 P.2d 114 (1984).

Plaintiffs also challenge the trial court's denial of their request to amend their complaint to add defendants. Plaintiffs sought to add as parties several directors and officers of respondent R. W. Beck and Associates, Raytheon Company as parent corporation of respondent United Engineers, and Enserch Corporation as owner of respondent Ebasco Services. The trial court held that plaintiffs' failure to join these defendants was the result of inexcusable neglect.

Plaintiffs contend that delay, excusable or not, is not sufficient to support the trial court's denial of their motion. Instead, plaintiffs argue that a showing of specific prejudice by the nonmoving party must be shown. *See Caruso v. Local 690, Int'l Bhd. of Teamsters,* 100 Wn.2d

343, 349, 670 P.2d 240 (1983) (delay alone insufficient to support denial of leave to amend to add new claims). However, in cases where leave to amend to add additional defendant has been sought, this court has clearly held that inexcusable neglect alone is a sufficient ground for denying the motion. *North St. Ass'n,* at 368; *Tellinghuisen v. King Cy.,* 103 Wn.2d 221, 223, 691 P.2d 575 (1984); *South Hollywood Hills Citizens Ass'n v. King Cy., supra* at 77. Generally, inexcusable neglect exists when no reasons for the initial failure to name the party appears in the record. *South Hollywood Hills Citizens Ass'n,* at 78. If the parties are apparent, or are ascertainable upon reasonable investigation, the failure to name them will be held to be inexcusable. *See* 3A L. Orland, Wash. Prac., comment § 5185, at 43–44 (3d ed. 1986 Supp.); *Tellinghuisen,* at 224 (no excuse where identity of omitted parties was matter of public record); *South Hollywood Hills Citizens Ass'n,* at 77 (no excuse because identity of omitted parties was matter of public record).

Here, plaintiffs only contend that they could not have discovered the identity of the defendants earlier. The record does not indicate plaintiffs' reasons. Nevertheless, the record shows that the identities of all the defendants sought to be added was readily available to plaintiffs from a variety of public sources. See, *e.g.,* Clerk's Papers, at 867 (outlining public documentation of respondent Ebasco's ownership by proposed new defendant Enserch); Plaintiffs' Supplemental Clerk's Papers, at 20 (detailing proposed new defendant Raytheon's ownership of respondent United Engineers); Clerk's Papers, at 779 (setting out annual reports filed with Washington Secretary of State identifying proposed new defendant officers and directors of respondent R. W. Beck and Associates, Inc.).

Plaintiffs' failure to avail themselves of this information prior to their third amended complaint, without evidence in the record to the contrary, supports the trial court's conclusion that plaintiffs' failure to name these defendants originally was the result of inexcusable neglect. Therefore,

the trial court did not abuse its discretion in denying plaintiffs' request for leave to amend its complaint to include additional defendants.

## IX
### SERVICE OF PROCESS

Plaintiffs challenge the trial court's dismissal of defendants Donald Patterson and Stanley Pardo on the basis of defective service of process. Patterson is a former officer of respondent Blyth, Eastman, Paine, Webber, Inc.; Pardo is presently an officer of respondent Paine Webber, Inc.

A civil action in the superior court is commenced by service of a copy of a summons, together with a copy of the complaint, as provided in CR 4. *See* CR 3. RCW 4.28.080 details the appropriate method of service of process for specific types of defendants. RCW 4.28.080(14), which describes the proper method of service for all defendants not specifically covered in sections 1–13, provides for service as follows:

> In all other cases, to the defendant personally, or by leaving a copy of the summons at the house of his usual abode with some person of suitable age and discretion then resident therein.

Concerning personal service *out–of–state,* which is applicable in the present situation, CR 4(e)(2) provides:

> Although rule 4 does not generally apply to personal service out of state, the prescribed form of summons may, with the modifications required by statute, be used for that purpose. See RCW 4.28.180.

RCW 4.28.180 provides:

> Personal service out of state. Personal service of summons or other process may be made upon any party outside the state. If upon a citizen or resident of this state or upon a person who has submitted to the jurisdiction of the courts of this state, it shall have the force and effect of personal service within this state; otherwise it shall have the force and effect of service by publication. The summons upon the party out of the state shall contain the same *and be served in like manner as personal summons within the state,* except it shall require the party to

appear and answer within sixty days after such personal service out of the state.

Proof of service is provided for in CR 4(g) which states in relevant part:

Proof of service shall be as follows:
. . .
(6) In case of personal service out of the state, the affidavit of the person making the service, sworn to before a notary public, with a seal attached, or before a clerk of a court of record.

While the affidavit of service, regular in form and substance, is presumptively correct, the return is subject to attack and may be discredited by competent evidence. *Lee v. Western Process Co.,* 35 Wn. App. 466, 469, 667 P.2d 638 (1983). Affidavits sworn to by individuals purportedly served asserting that they were not in fact personally served are considered by the courts as competent evidence discrediting averments to the contrary in affidavits of service. *See, e.g., Lee,* at 469.

Here, at the time service was purportedly made on his wife at his residence, neither Patterson nor his wife was at home. While Patterson's wife was allegedly served at home in New Jersey on August 15, 1984, she was in fact vacationing in Massachusetts from July 4, 1984, to September 2, 1984. See Affidavit of Jane Patterson; Clerk's Papers, at 1517. Moreover, Patterson was not at home any time between August 12, 1984, and August 19, 1984. See Affidavit of Donald Patterson; Clerk's Papers, at 1513. Patterson only discovered the summons and complaint when he returned home to find them on his porch, Clerk's Papers, at 1514, and has no recollection of receiving the copies purportedly mailed to him, Clerk's Papers, at 1515.

Plaintiffs affidavit of service on Pardo demonstrates defective service on its face, purporting to have served his personal secretary at his usual place of business on August 13, 1984, rather than at his residence. Additionally, Pardo's personal secretary has no recollection of the service at his place of business. See Affidavit of Sharon O'Reilly; Clerk's

Papers, at 1524. No attempt was made to serve Pardo at his residence. Pardo discovered the summons and complaint among the mail at his office sometime subsequent to August 13, 1984. See Affidavit of Stanley Pardo; Clerk's Papers, at 1521.

Plaintiffs do not dispute the Patterson and Pardo affidavits. Instead, they contend that their service of process constituted substantial compliance with procedural rules because both Patterson and Pardo eventually received notice of their suit. We disagree.

■■■ Initially, we observe that mere receipt of process and actual notice alone do not establish valid service of process. *See Spokane v. Department of Labor & Indus.*, 34 Wn. App. 581, 584, 663 P.2d 843, *review denied*, 100 Wn.2d 1007 (1983). Moreover, substantial compliance with out–of–state service requirements has been recognized only where the defect in service involved a late filing of nonresidency affidavits as required by RCW 4.28.185(4). *See Golden Gate Hop Ranch, Inc. v. Velsicol Chem. Corp.*, 66 Wn.2d 469, 472, 403 P.2d 351 (1965), *cert. denied*, 382 U.S. 1025 (1966); *Ryland v. Universal Oil Co.*, 8 Wn. App. 43, 45, 504 P.2d 1171 (1972); *Hatch v. Princess Louise Corp.*, 13 Wn. App. 378, 379, 534 P.2d 1036 (1975).

Here, the service was more than technically defective; the statutory procedures to ensure proper notice to nonresident defendants were not followed. As statutes authorizing service on out–of–state parties are in derogation of common law personal service requirements, they must be strictly pursued. *See State ex rel. Hopman v. Superior Court*, 88 Wash. 612, 617, 153 P. 315 (1915) (comparing out–of–state service statutes to service by publication).

The Washington long–arm statute was clearly not strictly pursued in the instant case. Mr. Patterson was *not* personally served, nor was the process delivered to a person of suitable age or discretion at his home. Rather, the summons and complaint were left outside the door of his house at a time when no one was present. Likewise, service upon Mr. Pardo was neither made upon him personally, nor upon a

person of suitable age or discretion at his home. Rather, the summons and complaint were either mailed to him, or dropped off at his place of business.

Finally, plaintiffs contend that service was made pursuant to the trial court's order granting plaintiffs leave to serve their third amended complaint on counsel for all defendants appearing in this action. Plaintiffs argue that because they served the complaint on Patterson and Pardo's counsel pursuant to that order, service was properly made pursuant to CR 4(e)(1) (providing that service may be made in manner prescribed by court order providing for service of summons and complaint).

Plaintiffs' argument is without merit. Voluntary appearances by defendants do not preclude their rights to challenge sufficiency of service pursuant to CR 12(b). CR 4(d)(5); *Adkinson v. Digby, Inc.*, 99 Wn.2d 206, 209, 660 P.2d 756 (1983). Moreover, the trial court's order allowing service of the third amended complaint did not provide for service of a summons. See Clerk's Papers, at 993. Thus, the order does not fall within the scope of CR 4(e)(1), and does not negate the original defective service.

We conclude that the trial court properly dismissed defendants Patterson and Pardo.

### Conclusion

For the reasons stated in our foregoing analysis, we reverse the trial court's judgment as to plaintiffs' and intervenors' claims under the Securities Act of Washington and intervenors' common law fraud and negligent misrepresentation claims. We also reverse the trial court's denial of plaintiffs' motion to allow the claims of newly added plaintiffs to relate back to the original filing date of this action. The trial court's judgment as to all remaining claims is affirmed.

We remand this case to the trial court for further proceedings consistent with this opinion.

UTTER, DORE, GOODLOE, and DURHAM, JJ., and WETHERALL, J. Pro Tem., concur.

PEARSON, C.J. (dissenting)—I would affirm the trial court's dismissal of all plaintiffs' and intervenors' Washington State Securities Act (WSSA) claims pursuant to CR 12(b)(6), as none of the complaints assert the necessary privity required to establish an action under RCW 21.20.430(1). Further, the majority has, in my opinion, misapplied the Restatement of Torts section 552 to allow the intervenors' negligent misrepresentation claims to stand. Therefore, I dissent.

I

WASHINGTON STATE SECURITIES ACT CLAIMS

A

Proper Construction of the WSSA

First and foremost, the reasonable interpretation of RCW 21.20.430(1) requires privity between plaintiff and defendant. The majority's expansive denomination of parties liable in a private action is without basis under the clear language of the WSSA.

This court interprets statutory language to implement legislative intent. *Seven Gables Corp. v. MGM/UA Entertainment Co.*, 106 Wn.2d 1, 6, 721 P.2d 1 (1986). The authoritative indicator of legislative intent is the plain and unambiguous meaning of the words in a statute. *State v. Johnson*, 104 Wn.2d 179, 181, 703 P.2d 1052 (1985). When the language of a statute is clear, the court must respect its ordinary meaning. *People's Org. for Wash. Energy Resources v. Utilities & Transp. Comm'n*, 104 Wn.2d 798, 825, 711 P.2d 319 (1985). The ordinary and clear meaning of "is liable to the person buying the security from him or her" in RCW 21.20.430(1) requires that the plaintiff bought a security from the defendant—that is, privity. Although the Washington Legislature has substantially altered section .430 during the ongoing development of numerous § 12(2) interpretations in the federal circuits, the original language in subsection .430(1) requiring privity remains intact. The majority ignores that legislative intent can be implemented only by retaining the plain meaning of that subsection.

Also, including only actual sellers under subsection .430(1) retains the net of liability obviously contemplated by the scheme of section .430. We interpret statutory language to render all sections meaningful. *State v. Q.D.*, 102 Wn.2d 19, 23, 685 P.2d 557 (1984). Only a strict privity approach ensures meaningful application of all portions of section .430; the majority's substantial factor–proximate cause approach renders subsection .430(3) repetitive and meaningless. For example, under the majority's interpretation an employee who falls under subsection .430(3) because he or she materially aids in the sale also necessarily falls under subsection .430(1) as a substantial factor causing the sale. Under a privity approach, however, the party who actually sold the security to the plaintiff is liable under subsection .430(1), and in subsection .430(3) the Legislature specifically delineated other parties liable by virtue of their status, knowledge, and participation in the sale, such as employees who materially aid.[2] Hence, the privity plainly required under the reasonable construction of the WSSA language avoids rendering subsection .430(3) superfluous.

Furthermore, the majority's comparison to the comments of the Uniform Securities Act is without merit. Our Legislature has not espoused that act and its comments in any part; indeed, only two states have adopted the act, and then with numerous variations. Unif. Sec. Act (1985), 7B U.L.A. 30 (Supp. 1987). Whether other states will adopt the act is not only speculative but improbable, because both

---

[2]RCW 21.20.430(3) provides:

"Every person who directly or indirectly controls a seller or buyer liable under subsection (1) or (2) above, every partner, officer, director or person who occupies a similar status or performs a similar function of such seller or buyer, every employee of such a seller or buyer who materially aids in the transaction, and every broker–dealer, salesperson, or person exempt under the provisions of RCW 21.20.040 who materially aids in the transaction is also liable jointly and severally with and to the same extent as the seller or buyer, unless such person sustains the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable."

the American Bar Association and the North American Securities Administrators Association criticized and refused to endorse it. *See* 19 Sec. Reg. & L. Rep. (BNA) 264 (1987); 18 Sec. Reg. & L. Rep. (BNA) 399 (1986).

The majority's reliance on tort law is also inappropriate and without merit. The question of the existence of a *statutory* cause of action is one of statutory construction; the majority's argument based on tort principles, therefore, is entirely misplaced. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 61 L. Ed. 2d 82, 99 S. Ct. 2479 (1979); *SEC v. Seaboard Corp.,* 677 F.2d 1289, 1294 n.4 (9th Cir. 1982). The WSSA does not supplant or mirror tort law remedies available to an injured party in a securities transaction. *Accord, Ging v. Parker–Hunter, Inc.,* 544 F. Supp. 49, 52 (W.D. Pa. 1982). In fact, the securities laws were created specifically to regulate a unique aspect of commerce that no other area of law touches upon, including common law tort. *See Bowden v. Robinson,* 67 Cal. App. 3d 705, 712, 136 Cal. Rptr. 871 (1977). It is for this very reason that the intervenors' common law negligent misrepresentation and fraud claims are treated and analyzed as actions separate from the WSSA claims.

## B
### Interpretation Mirroring Section 12(2)

The majority incorrectly imposes a meaning on the WSSA that allegedly mirrors the current federal circuit court trend in interpreting § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2) (1982). Although this court must not interfere with federal enforcement of the 1933 and 1934 securities acts, we need not interpret the WSSA in a duplicate manner. *Kittilson v. Ford,* 93 Wn.2d 223, 227, 608 P.2d 264 (1980).

Mirrored interpretation is improper because the purposes of the federal securities acts differ sharply from the purpose of the WSSA. Federal securities laws enforce disclosure and maintain integrity in the secondary securities markets, while the WSSA protects investors. Enforcement of the latter purpose is the only proper "broad remedial purpose"

pursuant to which the WSSA should be interpreted. *See Garretson v. Red–Co., Inc.,* 9 Wn. App. 923, 927–28, 516 P.2d 1039 (1973) (primary function of court is to carry out the legislative purpose of the WSSA); *see also Touche Ross & Co. v. Redington,* 442 U.S. at 578 ("generalized references to the 'remedial purposes' of the 1934 Act will not justify reading a provision 'more broadly than its language and the statutory scheme reasonably permit.' *SEC* v. *Sloan,* 436 U. S. 103, 116 (1978); see *Ernst & Ernst* v. *Hochfelder,* 425 U. S., at 200."). For this reason, we have in past cases employed the WSSA solely to enforce honesty in direct dealings between individuals. *See, e.g., McClellan v. Sundholm,* 89 Wn.2d 527, 534, 574 P.2d 371 (1978); *Clausing v. DeHart,* 83 Wn.2d 70, 73, 515 P.2d 982 (1973); *Kaas v. Privette,* 12 Wn. App. 142, 150, 529 P.2d 23 (1974). In fact, research has revealed no jurisdiction that granted a state securities cause of action in a situation involving no direct dealings in a firm commitment underwriting issue. Wrongful actions based on such a large–scale issue and impersonal transaction are properly redressed under the federal securities acts.

Mirrored interpretation is also improper because the scheme and express limitations of RCW 21.20.430 differ from those in § 12(2). For example, the § 12(2) statute of limitations would preclude this suit. 15 U.S.C. § 77m (1982). A government issuer such as the Supply System is not subject to suit under § 12(2); see majority opinion, at 122–24. Also, other than "sellers", Congress provided for liability only of "control persons" under § 12(2). 15 U.S.C. § 77o (1982). By contrast, other than those in privity, the Washington Legislature explicitly provided for liability of several participants in the sale: partners, directors, or employees who materially aid, for example. RCW 21.20.430(3). These differences reveal that although interpretations of § 12(2) may provide guidance, mirrored construction is patently misplaced and irresponsive to the WSSA.

Even under the federal § 12(2) standard proposed by the

majority, no defendants would be liable because the complaints contain no allegations that a defendant actually negotiated a particular buy–sell transaction, or was even remotely involved with the actual sellers, the underwriters.[3] Courts adopting the substantial participation–proximate cause test espoused by the majority limit liability to those actually participating in the particular sales transaction and preclude suit against those merely involved in preparing reports and offering circulars:

> The plaintiffs here merely allege that the individual defendants participated in preparing the Registration Statement and Prospectus and certain financing mechanisms; they do not allege any substantial participation by the individual defendants in the particular sales transactions. On this ground, the court will grant the defendants' motion to dismiss the plaintiffs' § 12(2) claims against the individual defendants.

*In re Diasonics Sec. Litig.,* 599 F. Supp. 447, 458 (N.D. Cal. 1984), *quoted in In re Victor Technologies Sec. Litig.,* [1986–1987 Transfer Binder] Blue Sky L. Rep. (CCH) ¶ 72,491 (N.D. Cal.); *see Hudson v. Capital Management Int'l, Inc.,* [1982–1983 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 99,222 (N.D. Cal.) (allegation that defendants offered opinions in sales circulars or directly disseminated information to investors is not adequate pleading of § 12(2) seller status); *Stokes v. Lokken,* 644 F.2d 779, 785 (8th Cir. 1981) (attorney's opinion letter, upon which auditor relied in issuing report for advertising materials, did not "approach the degree of participation required for liability under § 12"). For this reason, the participation test espoused by the majority is sometimes referred to as a "loose privity" standard. *In re Wicat Sec. Litig.,* 600 F.

---

[3]Indeed, the continued validity of the circuits' expansion on the plain meaning of "seller" in § 12(2) is doubtful in light of recent federal cases limiting private actions under the securities acts. *SEC v. Seaboard Corp.,* 677 F.2d 1289, 1294 nn.3 & 4 (9th Cir. 1982) (noting "the doubtful nature" of the "participant theory" espoused in *SEC v. Murphy,* 626 F.2d 633 (9th Cir. 1980) and cited as authority by a majority of this court, in light of recent Supreme Court cases prescribing "a strict statutory construction approach to the securities acts").

Supp. 1236, 1239 (D. Utah 1984).

The complaints at bench pertain to preparation of the prospectus and annual reports, and issuance of opinion letters—activities insufficient as a matter of law to constitute the "substantial participation–proximate cause" in a particular buy–sell transaction. Indeed, a purchaser may never sue an issuer under § 12(2) in a firm commitment underwriting arrangement such as the WNP 4 and 5 bond issues; in such an instance, "even under the loosest privity standard", the proper defendant is the actual seller, the underwriter. *In re Wicat Sec. Litig.*, at 1242; *see In re Fortune Sys. Sec. Litig.*, 604 F. Supp. 150, 163 (N.D. Cal. 1984). Thus, even under the modern view of the federal "participation" approach adopted by the majority, plaintiffs' and intervenors' complaints should be dismissed.

## C
### Interpretations of Other State Securities Acts

My examination of interpretations of other state securities acts confirms that the Legislature intended to require privity under the WSSA. The majority determines that other courts' interpretations of state securities acts are "inconclusive" toward interpreting the WSSA. Majority opinion, at 129. On the contrary, the methodology employed by other courts provides insightful direction. As a general rule, other courts strictly construe state statutes according to their plain language. The majority unfortunately chooses to ignore this logical methodology.

State courts require the plaintiff to establish privity with the defendant to state a cause of action under acts with language similar to subsection .430(1)'s "Any person, who offers or sells a security in violation . . . is liable to the person buying the security from him or her". For example, in California the words "any person acquiring from him" require privity as a condition of recovery. *Bowden v. Robinson,* 67 Cal. App. 3d 705, 712, 136 Cal. Rptr. 871 (1977). In Oklahoma the term "any person who offers or sells" also requires strict privity as a condition of recovery. *Nikkel v.*

*Stifel, Nicolaus & Co.,* 542 P.2d 1305, 1307–08 (Okla. 1975).
In Texas, it appears that a defendant who does anything
less than negotiate the sale of stock is not a seller "liable to
the person buying the security from him". *Stone v.
Enstam,* 541 S.W.2d 473, 480 (Tex. Ct. App. 1976); *see also
Huddleston v. Herman & MacLean,* 640 F.2d 534, 551 (5th
Cir. 1981) (interpreting *Stone v. Enstam, supra,* as limiting
state securities actions to those actions against one engaged
in the sale process and never including purchases on the
open market not from the defendant), *rev'd in part on
other grounds in* 459 U.S. 375, 74 L. Ed. 2d 548, 103 S. Ct.
683 (1983). The court in *Anders v. Dakota Land & Dev.
Co.,* 380 N.W.2d 862 (Minn. Ct. App. 1986) denied a state
securities action, although it did adopt a definition of
"seller" identical to a federal interpretation of § 12(2).
*Anders,* at 868. A later Minnesota case, however, implicitly
limits the *Anders* interpretation *by* refusing to grant an
action against a defendant not the agent of a seller in priv-
ity. *Norwest Bank Hastings v. Clapp,* 394 N.W.2d 176, 178
(Minn. Ct. App. 1986). The *Norwest Bank Hastings* court
determined that the seller's lender, who did not work for
the seller in privity but who through his contact and advice
to the buyer instrumentally influenced the decision to pur-
chase, was not liable under the portion of the statute hold-
ing a "seller's" agent who materially aids liable. *Norwest,* at
178.

State courts expanding upon the privity approach do so
pursuant to strict interpretation of statutory language that
holds liable those who "participate" or "materially aid" in
the fraudulent sale, unlike the WSSA language. These
courts do not rely on federal circuit court trends in inter-
preting the federal securities acts; rather, they reasonably
interpret statutory language in reaching their conclusions.
*E.g., Fakhrdai v. Mason,* 72 Or. App. 681, 684, 696 P.2d
1164 (1985); *Froehlich v. Matz,* 93 Ill. App. 3d 398, 408–09,
417 N.E.2d 183 (1981). The WSSA only holds sellers in
privity liable; no "participants" are subject to suit under
subsection .430(1). Hence, the majority's expansion of the

WSSA liability section is clearly unsupported by other states' interpretations of their acts.

When federal courts exercising pendent jurisdiction recognize that state acts should be construed not as a mirror of federal § 12(2) but with respect to their unique purpose and language, they generally employ a plain meaning interpretation. Hence, many federal courts construing statutes similar to the WSSA interpret those acts as requiring privity, regardless of their interpretation of federal § 12(2). *E.g., SEC v. Seaboard Corp.,* 677 F.2d 1289, 1295–96 (9th Cir. 1982) (allowing suit against participants as potentially liable "sellers" under § 12(2), but precluding suit absent privity under the California State Securities Act); *In re Victor Technologies Sec. Litig.,* [1986–1987 Transfer Binder] Blue Sky L. Rep. (CCH) ¶ 72,491 (N.D. Cal.) (holding actual participants in the selling process liable under § 12(2), but requiring "strict privity" under the California State Securities Act); *see also Sharp v. Coopers & Lybrand,* 649 F.2d 175, 192 (3d Cir. 1981) (accountant who issued opinion letter used in sales program not liable under Pennsylvania Securities Act because accountant was not the actual seller), *cert. denied,* 455 U.S. 938 (1982); *Fickinger v. C.I. Planning Corp.,* 556 F. Supp. 434, 436 (E.D. Pa. 1982) (privity required under Pennsylvania Securities Act; hence advisor and parent company not liable under the act for alleged misrepresentations and omissions because they did not actually sell the security to the plaintiff). Hence, the majority's expansion of the WSSA liability section is unsupported by federal court interpretations of state securities laws.

## D
### Conclusion

I would interpret the WSSA to enforce its plain meaning, affording a civil action to purchasers only against the sellers from whom they purchased. This construction enforces the unique purpose of the WSSA and renders all sections meaningful. The majority's interpretation that mirrors § 12(2) is misplaced in light of the unique purpose, language,

and scheme of the WSSA.

Also, the complaints should be dismissed even under the federal test adopted by the majority. No allegation asserts that a defendant participated in a particular sales transaction to a particular plaintiff; indeed, such an allegation is impossible because the WNP 4 and 5 bonds were sold pursuant to a firm commitment underwriting arrangement. In addition, interpretations of other state securities acts should provide us with guidance: when examined, they are construed according to their plain language. A similar approach is appropriate for the WSSA.

The allegations at bench which do not assert that a defendant had any connection to the actual sellers, the underwriters, should not withstand defendants' motion to dismiss. I therefore would affirm the trial court's CR 12(b)(6) dismissal of the WSSA claims.

## II
### INTERVENORS' NEGLIGENT MISREPRESENTATION CLAIM

Proper application of section 552 precludes the intervenors' negligent misrepresentation claim. I therefore dissent from that portion of the majority opinion reversing the trial court's dismissal of the negligent misrepresentation claim.

In determining whether a cause of action for negligent misrepresentation will lie, jurisdictions differ on the scope of the duty owed to the plaintiffs. The minority of courts follow the "foreseeability" approach. *See, e.g., International Mortgage Co. v. John P. Butler Accountancy Corp.,* 177 Cal. App. 3d 806, 820, 223 Cal. Rptr. 218 (1986); *Citizens State Bank v. Timm, Schmidt & Co., S.C.,* 113 Wis. 2d 376, 386, 335 N.W.2d 361 (1983). Liability under the foreseeability approach extends to all "reasonably foreseeable" plaintiffs who relied on the negligent misrepresentations. *International Mortgage,* at 820; *Citizens State Bank,* at 386.

A majority of courts, however, criticize the foreseeability approach and follow the Restatement (Second) of Torts § 552 (1977). These courts refuse to impose liability on a

limitless group of potential plaintiffs when the defendant is merely negligent. *In re Consumers Power Co. Sec. Litig.,* 105 F.R.D. 583, 596–98 (E.D. Mich. 1985).

> When there is no intent to deceive but only good faith coupled with negligence, the fault of the maker of the misrepresentation is sufficiently less to justify a narrower responsibility for its consequences.

Restatement (Second) of Torts § 552, comment *a* (1977). *See also* Restatement (Second) of Torts § 552, comment *h* (1977) (persons liable under section 552 are "distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it"). Hence, liability under section 552 is limited to loss suffered "by the person or one of a *limited group* of persons *for whose benefit and guidance he intends to supply* the information or knows that the recipient intends to supply it". (Italics mine.) Restatement (Second) of Torts § 552(2)(a) (1977). This court adheres to the Restatement (Second) of Torts § 552 (1977). *Transamerica Title Ins. Co. v. Johnson,* 103 Wn.2d 409, 415, 693 P.2d 697 (1985); *see also Wilber v. Western Properties,* 22 Wn. App. 458, 463, 589 P.2d 1273 (1979).

The majority correctly affirms that section 552 defines the scope of the duty owed a plaintiff in Washington who is suing for negligent misrepresentation. In my opinion, however, the court then incorrectly applies section 552 to the pleadings in this case. As a matter of law, section 552 precludes the intervenors' action for negligent misrepresentation.[4]

Section 552 precludes suit for negligent misrepresentation when the defendant merely conveys information to a limitless and unrestricted class of investors. In such a situation, courts find a duty only if they reject section 552 and

---

[4]Admittedly, under illustration 6 of section 552, the situation at bench could be construed to fall within the ambit of section 552. As applied, however, no court following section 552 allows suit when information is conveyed to a limitless and unrestricted class of potential investors, as was the case at bench.

adopt the foreseeability approach. *E.g., International Mortgage Co. v. John P. Butler Accountancy Corp.,* 177 Cal. App. 3d at 820 (under the section 552 approach, accountant who negligently prepared financial statements for firm was not liable to purchasers of firm's stock who relied on statements; accountants were potentially liable under the foreseeability approach); *Citizens State Bank v. Timm, Schmidt & Co., S.C.,* 113 Wis. 2d at 386 (under the section 552 approach, accountant who negligently prepared auditing statements for corporation was not liable to party who relied on statements in loaning money to corporation; accountants were liable under the foreseeability approach). Absent a known and limited number of relying parties, those courts adhering to section 552 and rejecting the foreseeability approach preclude an action altogether. *E.g., Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 553, 493 N.Y.S.2d 435 (1985) (accountants liable to a known relying party, but not to "any foreseeable plaintiff"); *Briggs v. Sterner,* 529 F. Supp. 1155, 1177 (S.D. Iowa 1981) (accountants not liable to foreseeable investors; court follows section 552 and refuses to hold accountants liable because plaintiff investors were not actually known and were of an unlimited class at the time the statements were prepared—"the risk to be perceived at the time of the undertaking defines the nature of the duty of ordinary care owed to third parties."); *see Milliner v. Elmer Fox & Co.,* 529 P.2d 806, 808 (Utah 1974) (accountant who prepared statements for corporation was not liable to purchasers of stock under approach similar to section 552, requiring that accountant knew that "particular" parties would rely on the report for a particular purpose, because a future purchaser of stock belongs to an unlimited class).

The majority cites one non–Washington case wherein a "foreseeable" plaintiff was allowed a cause of action under section 552. *Chubb Group of Ins. Cos. v. C.F. Murphy & Assocs.,* 656 S.W.2d 766, 774–76 (Mo. Ct. App. 1983). The *Chubb* court found contractors, an architect, and a steel manufacturer liable to plaintiffs injured when a bridge that

had been negligently constructed collapsed. The majority's use of *Chubb* is, however, ill suited to the case at bench. Section 552, comment *a* clearly states that the law governing the *Chubb* situation, physical injury, is not analogous to the law governing the situation at bench, monetary loss caused by negligently supplying incorrect information. Moreover, because services are crafted to meet the needs of individual clients, they cannot be likened to a product whose design and manufacture impact equally on all users. *Guy v. Liederbach,* 501 Pa. 47, 58, 459 A.2d 744 (1983). Hence, *Chubb* should not authoritatively direct application of section 552 to the intervenors' complaint.

No intervenor claims to be the beneficiary of a *particular* misrepresentation involving a transaction with a *limited* group of people. All alleged negligent misrepresentations were disseminated to the general public, and no investor received information made uniquely available for his or her benefit. Intervenors' actions for negligent misrepresentation should therefore fail under section 552, and the trial court's CR 12(b)(6) dismissal of this claim should be affirmed. I therefore dissent from the majority's holding.

In sum, I dissent because the majority improperly reverses the trial court's CR 12(b)(6) dismissal of the plaintiffs' and intervenors' WSSA claims, and of the intervenors' negligent misrepresentation claim. I concur in the majority opinion in all other respects.

DOLLIVER and ANDERSEN, JJ., concur with PEARSON, C.J.

After modification, further reconsideration denied February 19, 1988.